**UNITED STATES of America,**
**Plaintiff,**

v.

**ASSOCIATED PATENTS, Inc., Brown & Sharpe Manufacturing Company, The Carlton Machine Tool Company, DeVlieg Engineering Company, DeVlieg Machine Company, Charles B. DeVlieg, The Lodge & Shipley Machine Tool Company, and The Mac Investment Company, Defendants.**

**Civ. A. No. 10664.**

United States District Court
E. D. Michigan, S. D.

June 20, 1955.

John W. Neville, Paul A. Owens, Donald Ferguson, Detroit, Mich., for the United States.

Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., Rockwell T. Gust, Detroit, Mich., A. H. Brenan, James T. Hoffmann, Cleveland, Ohio, of counsel, for defendants.

THORNTON, District Judge.

Complaint was filed and action was instituted against the defendants under Section 4 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended, entitled "An act to protect trade and commerce against unlawful restraints and monopolies", commonly known as the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, in order to prevent and restrain alleged continuing violations by the defendants of Section 1 of the Sherman Act, it being the further claim of the plaintiff that beginning in or about the year 1933, and continuing thereafter up to and including the date of the filing of this complaint, the defendants have contracted, combined and conspired to restrain unreasonably the aforesaid interstate trade and commerce in machine tools, in violation of Section 1 as aforesaid; further alleging that the defendants are continuing, and threaten to, and will continue the said offenses unless the relief prayed for in the complaint be granted. It is further alleged that the terms of the contracts, combination and conspiracy have been:

(a) That defendants organize API and pool in API their existing and future patent rights relating to machine tools;

(b) That defendants allocate among themselves the manufacture and sale of machine tools according to specified types thereof, so that each defendant has the exclusive right to manufacture and sell specified types of machine tools, and so that each defendant refrain from the manufacture and sale of types of machine tools reserved for exclusive manufacture and sale by any other defendant;

(c) That API refrain from licensing under the pooled patents others than defendants to manufacture and sell any types of machine tools reserved for exclusive manufacture and sale by any of the defendants.

The "machine tools" referred to include power-driven machines, not portable by hand, which are used to cut or shape metal, and includes machine tools of the following types: lathes, shaving machines, drilling machines, boring machines, milling machines, broaching machines, grinding machines, gear producing machines, and screw machines.

It is further alleged that the contracts, combination and conspiracy, and certain of the acts, agreement, arrangements and understandings of the defendants have had the effect, as intended by the defendants, of eliminating, suppressing and restraining competition among the defendants in the manufacture and sale of machine tools in interstate commerce; of eliminating, suppressing and restraining competition among the defendants in obtaining, utilizing and licensing patent rights relating to machine tools; of eliminating, suppressing and restraining competition by others in the manufacture and sale of machine tools, and of denying a purchaser of machine tools access to a free and competitive market therefor.

From the evidence submitted at a rather extended trial, the Court makes the following

Findings of Fact

1. Associated Patents, Inc., hereinafter referred to as "API", is a corporation organized under the laws of the State of Ohio, with its principal place of business at Cincinnati, Ohio. API has functioned solely as a patent holding and licensing company. It has never engaged in manufacturing or other activities. The capital stock of API has at all times been evenly divided between the following five companies or their predecessors in interest: Brown & Sharpe Manufacturing Company, The Carlton Machine Tool Company, DeVlieg Engineering Company, The Lodge & Shipley Company, and The Mac Investment Company.

2. Brown & Sharpe Manufacturing Company, hereinafter referred to as "Brown & Sharpe", is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business at Providence, Rhode Island. It is engaged in the manufacture and sale of milling machines, grinding machines, automatic screw machines, and other types of machine tools.

3. The Carlton Machine Tool Company, hereinafter referred to as "Carlton", is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business at Cin- cinnati, Ohio. It is engaged in the manufacture and sale of radial drilling machines.

4. The Lodge & Shipley Company, formerly known as The Lodge & Shipley Machine Tool Company, hereinafter referred to as "Lodge & Shipley", is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business at Cincinnati, Ohio. It is engaged in the manufacture and sale of lathes.

5. The Lucas Machine Tool Company, hereinafter referred to as "Lucas", was a corporation organized and existing under the laws of the State of Ohio, with its principal place of business at Cleveland, Ohio. It was engaged in the manufacture and sale of horizontal boring, drilling and milling machines. In 1945 it merged with McDonald, Coolidge & Company, a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Cleveland, Ohio. In 1948, the physical assets of Lucas were sold and the name was changed to The Mac Investment Company. The Mac Investment Company retains any interest of Lucas not sold in 1948.

6. The DeVlieg Machine Company is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business at Ferndale, Michigan. It is engaged in the manufacture and sale of a horizontal boring, drilling and milling machine called the "Jigmil".

7. The DeVlieg Engineering Company is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business at Ferndale, Michigan. It is the successor to a former co-partnership of the same name, and is a party to the API agreements, but is inactive and is not engaged in manufacturing or selling any product.

8. Charles B. DeVlieg, a resident of Farmington, Michigan, and owner, with other members of his family, of the controlling interest in the DeVlieg Engineering Company and the DeVlieg Ma-

chine Company, is an inventor in the machine tool field. Prior to 1933 he had developed three major inventions of general application in the machine tool field known as a backlash eliminator, an automatic power transmission mechanism, and an automatic positioning device. These inventions shall hereinafter be referred to collectively as the "subject matter inventions" and their patents as the "subject matter patents".

9. The machine tools manufactured by defendants as aforesaid are sold and shipped in interstate commerce to states other than the states of origin or where they are manufactured.

10. An essential characteristic of the manufacture of machine tools by defendants and other members of the machine tool industry is the development of improvements, securing patents thereon, the issuing of licenses and the obtaining of licenses on patents owned by other machine tool manufacturers.

11. On September 3, 1931, Charles B. DeVlieg granted Lucas an exclusive license on two of his inventions, the backlash eliminator and the power transmission mechanism, for use on horizontal boring, drilling and milling machines. No provision was made in this agreement for the licensing of future improvement patents.

12. On October 7, 1932, Charles B. DeVlieg granted Carlton an exclusive license on all three of the subject matter inventions, for the manufacture, use and sale of drilling machines. The license included future improvements on the subject matter inventions.

13. On October 7, 1932, Charles B. DeVlieg granted Lodge & Shipley an exclusive license on the subject matter inventions for the manufacture, use and sale of lathes. The license included future improvements on the inventions. By a subsequent agreement dated May 18, 1933, DeVlieg granted Lodge & Shipley an exclusive license on the same inventions for use on shaving machines.

14. On November 29, 1932, Charles B. DeVlieg granted Brown & Sharpe a non-exclusive license on the subject matter inventions for the manufacture, use and sale of machine tools, without specification of particular types of machines. This agreement provided that future improvements on the subject matter inventions developed by either party were to be licensed to the other party. DeVlieg agreed not to license competitors of Brown & Sharpe on these inventions without that company's approval.

15. By an agreement dated May 18, 1933, between Charles B. DeVlieg, party of the first part, and Lodge & Shipley and Carlton, parties of the second part, DeVlieg agreed to assign the subject matter inventions to a corporation to be known as Associated Patents, Inc.

16. By a series of assignments dated June 13, 1933, Charles B. DeVlieg transferred all rights in the subject matter inventions and the patent applications thereon to API.

17. A meeting was held in Cincinnati, Ohio, shortly prior to August 3, 1933, to discuss terms and conditions under which the subject matter patents would be administered by API. Present at this meeting, held in the law offices of Dolle, O'Donnell & Cash, attorneys for Lodge & Shipley, were Messrs. Jack Carlton, President of Carlton, J. Wallace Carrel, President of Lodge & Shipley, Henry M. Lucas, President of Lucas, Paul DeWolf, Vice President of Brown & Sharpe, and Charles B. DeVlieg, as well as Messrs. William L. Dolle and George Fee, members of the aforementioned law firm. The meeting lasted approximately three days. Discussions at the meeting centered on the practice of the subject matter inventions in accordance with a so-called "Declaration of Uses" restricting each member of API to the use of the subject matter inventions and future improvements thereon within a given field, non-competitive with any other member. Understandings reached at the meeting in this respect were reduced to a formal agreement dated August 3, 1933, referred to hereinafter as the "API agreement" (Gov. Ex. 12). The agreement was drafted by attorney George

Fee, attorney of record for Lodge & Shipley in this case.

18. The principal provisions of the API agreement are as follows:

(a) The parties to the agreement were the five machine tool manufacturing companies, API, the newly organized patent-holding corporation and Charles B. De-Vlieg, individually as the inventor.

(b) The agreement was applicable to the three original DeVlieg inventions (the backlash eliminator, the power transmission mechanism, and the automatic positioning device) and all improvements thereon developed by the members. The term "improvements" was specifically defined in the agreement "to include all improvements or betterments of the subject matter * * * together with all inventions which supplement or extend the subject matter or improvements or the uses of either or both * * * "

(c) The agreement was to continue as long as there were outstanding any unexpired patents on the subject matter or improvements thereon.

(d) The members of API were obligated to make prompt disclosure to API of any and all improvements on the subject matter developed by them or their employees and to assign such improvements to API. The expenses incurred in connection with the obtaining of patents on improvements so assigned were to be borne by API.

(e) The "Declaration of Uses" provision of the agreement specified the particular fields within which the subject matter patents and improvements thereon were to be exclusively licensed to the respective companies. Each field of use consisted of several types of machine tools and with one exception these fields of use were mutually exclusive and non-competitive.

(f) Each of the parties to the API agreement was entitled to receive an exclusive license within the field defined in its Declaration of Use on any improvement assigned to API.

(g) Members of API were required to pay a royalty of ½ of 1 per cent of the net selling price of all machine tools incorporating an improvement not perfected by such party. Regardless of the number of improvements incorporated in any particular machine tool the aggregate royalty was not to exceed 1 per cent. A member was not required to pay a royalty on the use of any improvement that it had assigned to the pool.

(h) API was to undertake the defense of any action, suit or claim for infringement, brought against any of the member companies as a result of the manufacture, use, or sale of any machine tools incorporating the subject matter patents or any improvement thereon, and any damages payable by reason of such actions were to be borne by API.

(i) API was to have the sole and exclusive right to grant licenses and sublicenses on the subject matter patents and improvements thereon, provided, however, that no licenses were to be granted within the exclusive fields of use reserved to the various members without the prior consent of the member within whose field of use such prospective license was to be granted.

(j) The scope of the Declaration of Use assigned to each party could be extended only by API, but no such extension could be granted to any member which would conflict with the Declaration of Use of any other party except with the consent of that party.

(k) Licenses upon improvements were to be non-assignable and non-transferable except where the party being granted the license had assigned such improvement to API.

(l) In the event of insolvency of any member the licenses on improvements not developed by such party were to be terminated forthwith.

(m) In the event that an API member desired to dispose of its stock in the corporation API was to have 30 days within which to exercise an option to purchase

such stock at its book value before it could be disposed of to an outside party.

19. The rights and obligations of the parties as provided in the API agreement created an entirely new and different arrangement for the use of the subject matter patents and future improvement patents than had existed under the original licenses from DeVlieg to the other parties separately. The more important differences between the new arrangement and that which had previously existed are as follows:

(a) Lucas became entitled to use the automatic positioning device which had not been included in its original license from DeVlieg. The original license had been limited to horizontal boring, drilling and milling machines whereas the field of use assigned to Lucas by the API agreement also included jig-boring machines.

(b) Brown & Sharpe's license from DeVlieg had not been limited to particular types of machine tools but applied to all "machine tools of their own manufacture". In the API agreement Brown & Sharpe was assigned a field of use limited to several specific types of machine tools. Also, the license from DeVlieg was to terminate, as to each of the three subject matter inventions, on the expiration date of the first patent to be issued on that invention whereas the API agreement was to continue in force as long as there were unexpired patents on either the subject matter inventions or improvements.

(c) Prior to the API agreement DeVlieg was free to utilize the subject matter inventions and his own improvements thereon in the manufacture, use and sale of any type of machine tool except as limited by the exclusive licenses to Lucas, Carlton and Lodge & Shipley. Under the API agreement DeVlieg was confined to a field consisting of milling machines and broaching machines.

(d) The original DeVlieg licenses, except for that to Lucas, included future improvement patents developed by DeVlieg but there were no agreements between any of the licensees pertaining to improvement patents. Under the API agreement each party became entitled to an exclusive license within its field of use on any improvement developed by any other member.

(e) Prior to the API agreement Carlton, Lodge & Shipley and Brown & Sharpe had been entitled to licenses on all improvement patents developed by DeVlieg without being obligated to pay royalties or the expenses connected with patent applications. Under the API agreement these companies were not only obligated to pay royalties for the use of improvement patents developed by DeVlieg but were required to assume a proportionate share of the expenses incurred by API in obtaining patents on such improvements.

(f) The API agreement imposed limitations on the transferability of the licenses to be granted to the parties whereas the original licenses from DeVlieg had not been subject to such limitations.

20. The purposes of API as evidenced by the provisions of the API agreement were:

(a) To suppress competition between the parties by confining their use of the API inventions to non-competitive fields of activity.

(b) To restrict outside parties in competing with API members by denying them access to the subject matter patents and the improvements thereon subsequently developed by API members.

21. The purpose of the parties in imposing restrictions upon the granting of licenses on improvements was not to enhance the financial returns from royalties but to insulate members from competition between themselves and from outsiders. Each member by agreeing to restrictions upon the licensing of improvements designed to protect other members from competition was, in turn, assured that licenses upon improvements developed by other members would be similarly restricted.

22. API was in substance and effect merely an agency or instrumentality utilized by the members to effect a network

of exclusive cross-licenses among themselves and to control the terms and conditions of any licenses that might be granted to outsiders. The actions and policies of API were controlled entirely by the member companies who directed its activities to serve their individual purposes. Thus, API had no independent control of its own affairs.

23. From August 1933 until July 13, 1953, there was a concert of action in pursuance of a common plan among the defendants herein by which restrictions were imposed upon the manner in which licenses would be issued upon improvements developed by the API members. On July 13, 1953, one of the Courts of Common Pleas for Hamilton County, Ohio, ordered a limited dissolution of the affairs of API and, subsequent to that date, certain of the shareholders of API have filed with the Ohio court having jurisdiction of the dissolution proceedings disclaimers of all claims to assets of API, and of all rights under the API agreement.

24. Concurrent with the execution of the API agreement the members arrived at a general unwritten agreement not to compete in the manufacture of machine tools irrespective of whether or not API patents were utilized. To implement this general agreement not to compete, a number of subsidiary agreements were made from time to time when a new machine designed by one party threatened to conflict or compete with a machine being manufactured by another party, to wit:

(a) In August 1933, Carlton was designing a new drilling machine capable of both horizontal and vertical drilling. This machine threatened to conflict with the horizontal boring, drilling and milling machines being manufactured by Lucas and encroach upon the field reserved to Lucas in its declaration of use in the API agreement. The Carlton machine did not embody inventions covered by API patents. Henry M. Lucas, President of the Lucas Machine Tool Company, visited Carlton's plant and examined the blueprints of Carlton's new drilling machine. Carlton requested drawings of the Lucas machine involved in the conflict. It was subsequently agreed between Lucas and Carlton that there would be no conflict in their respective manufacture of the machines involved.

(b) In March 1934 Charles B. DeVlieg visited the Brown & Sharpe plant in Providence, Rhode Island and because of Mr. DeVlieg's status as a member of API he was shown confidential designs being developed by Brown & Sharpe for a new milling machine called their No. 12. Some time prior to this date Brown & Sharpe and DeVlieg reached an agreement designed to prevent competition between them in the manufacture and sale of milling machines whereby DeVlieg would manufacture only the larger sizes and Brown & Sharpe would manufacture only the smaller ones. This agreement was not limited to milling machines incorporating API patents. On learning that DeVlieg was designing a milling machine of a size which would compete with the Brown & Sharpe No. 12 milling machine, Brown & Sharpe protested to DeVlieg that this was a violation of their agreement. DeVlieg replied that he recognized his obligation not to produce a competing machine and would not do so unless an arrangement could be decided upon at some future date. After Brown & Sharpe's protest, and out of deference to the understanding, DeVlieg did not go ahead with his plans for manufacturing a machine of that size although such a machine had already been designed.

(c) In 1938 DeVlieg was designing a knee type milling machine which incorporated a sliding spindle. Despite the fact that DeVlieg believed that the machine he proposed to produce was entirely within the Declaration of Use allocated to him by the API agreement he nevertheless felt that the understanding among API members required him to obtain from Lucas a letter of approval before going ahead with the production of such a machine. Lucas was the API member

whose machine tools would be most nearly competitive with the machine that DeVlieg proposed building.

(d) In 1941 DeVlieg was requested by the War Production Board to concentrate his activities on the production of horizontal boring, drilling and milling machines. After making preliminary drawings and designs for the production of such a machine (which later came to be known as the Jigmil), DeVlieg went to Cleveland for the purpose of consulting with Lucas. DeVlieg sought clearance from Lucas which would permit him to commence manufacturing activities within the field that was exclusively reserved to Lucas by the Declaration of Uses provision of the API agreement. On this occasion he exhibited to Lucas the preliminary drawings for the machine. Subsequently, in July of 1941 when Lucas visited DeVlieg's plant in Ferndale he inspected the work that was being done on the design and development of the Jigmil and asked for and received a set of drawings which he took back to Cleveland. Thereafter in December of 1941 while visiting DeVlieg's plant, Lucas saw the first machine in operation. During this visit the conversation turned to the possibility of competition between the Jigmil as produced by DeVlieg and the horizontal boring, drilling and milling machines manufactured by Lucas. Lucas was at this time producing a combined horizontal boring, drilling and milling machine in which the axis of the spindle was parallel to the bed. The Jigmil as designed by DeVlieg was differentiated from Lucas' product in that the axis of the spindle was at right angles to the bed. On this occasion DeVlieg and Lucas arrived at an understanding the essence of which was that each agreed not to produce the type of combined horizontal boring, drilling and milling machine being manufactured by the other.

25. In 1945 The Lucas Machine Tool Company notified DeVlieg that by incorporating devices covered by API patents into the Jigmil, he was violating Lucas' rights under the API agreement which granted to Lucas the exclusive right to use these inventions in horizontal boring, drilling and milling machines. It also charged that DeVlieg was infringing two other Lucas-owned patents which had not been assigned to API. Lucas also claimed that DeVlieg's Jigmil patent was an improvement within the meaning of the API agreement, and that, accordingly, DeVlieg was obligated to assign it to API.

26. In April, 1947, at a directors' meeting held in Atlantic City, New Jersey, the members of API voted to support The Lucas Machine Tool Company with respect to the claims it was asserting against DeVlieg. A motion was adopted at this meeting which provided that, if necessary, API would bring suit against DeVlieg to enforce these claims, or join with Lucas in such a suit. During the succeeding months various members of API made efforts to bring DeVlieg and Lucas together in order that an out-of-court settlement of the controversy might be reached. Throughout these efforts to effect a settlement both API and Lucas made it an indispensable condition that DeVlieg agree to assign the Jigmil patent to API. The insistence upon this condition caused the attempts to reach a settlement to be unsuccessful.

27. On July 16, 1947, API and The Lucas Machine Tool Company filed suit against DeVlieg in the District Court of the United States, Eastern District of Michigan, Southern Division, (Civil Action No. 6813). In the second cause of action alleged in this suit, The Mac Investment Company, as successor to Lucas, and API are relying upon the API agreement in the following two respects:

(a) They are asserting a claim for damages based upon an alleged invasion by DeVlieg of the field of exclusive use assigned to The Lucas Machine Tool Company by the Declaration of Use provision of the API agreement.

(b) They are asking the Court for an order of specific performance requiring DeVlieg to assign the Jigmil patent (2,-391,398) to API on the ground that it is an improvement within the meaning of

that term as used in the API agreement, and that by virtue of the provision of Article II he is obligated to assign it to API.

This suit is still pending.

28. The business done by Brown & Sharpe in the milling machine field has been a substantial proportion of the total dollar volume of business done in this field of manufacture. In recent years Brown & Sharpe's total sales have amounted to approximately 53 million dollars annually, and of this total approximately 3½ million has been in the field of milling machines.

29. The business done by Lodge & Shipley in the field of engine lathes has been a substantial proportion of the total dollar volume of business done in this field of manufacture. In recent years Lodge & Shipley's total sales have amounted to approximately 20 to 21 million dollars.

30. The business done by Carlton in the radial drilling field has been a substantial proportion of the total dollar volume of business done in this field. In recent years Carlton's total sales have amounted to approximately 6 to 7 million dollars.

31. After its formation, API became the owner of seven improvements developed by the members and assigned to it in accordance with the requirements of the API agreement.

32. The whole course of defendants' conduct with relation to the three subject matter patents indicates that they recognized the inventions as highly important, fundamental and valuable contributions to the machine tool art.

## Conclusions of Law

■ 1. The Court has jurisdiction of the subject matter hereof and of each of the defendants, and the complaint states a cause of action against the defendants under the provisions of the Act of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies", as amended, commonly known as the Sherman Act.

■ 2. The API agreement of August 3, 1933, created an arrangement for the exclusive cross-licensing of the subject matter patents and future improvement patents therein through the pooling of these patents in API. The combined effect of the provisions of the API agreement was to impose the following unreasonable restraints:

(a) The parties were restricted in their manufacture of machine tools by being unable to obtain licenses permitting them to incorporate features covered by the subject matter patents or improvements thereon on machine tools not included in their respective fields of use.

(b) Outside parties were restricted in their manufacture of machine tools by being foreclosed from obtaining licenses on the subject matter patents or improvements thereon for any of the types of machine tools included within the fields of use exclusively reserved to API members.

(c) Each of the parties was restricted in the licensing of improvement patents it developed by the requirements that all improvement patents be assigned to API.

(d) Invention and technological development have been discouraged by the limitations imposed on the members' rights to use and license improvement patents developed by them.

3. By their continued adherence to the API agreement defendants have engaged in a continuing conspiracy to unreasonably restrain interstate commerce in the manufacture of machine tools in violation of Section 1 of the Sherman Act.

4. The agreement of 1933 between Brown & Sharpe and DeVlieg concerning the size of milling machines each would manufacture; the agreement of 1933 between Carlton and Lucas with respect to eliminating competition between the types of machine tools each would manufacture; the clearance sought by DeVlieg from Lucas in 1938 to build a bed type milling machine with sliding spindle; and the approval requested by

DeVlieg from Lucas in 1941 in order to enable him to go ahead with the building of a Jigmil were integral parts of an over-all conspiracy between the API members by which the manufacturing activities of the member corporations have been confined to the fields of specialization delineated in the Declaration of Uses provision of the API agreement. Since August of 1933, the defendants have been engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in machine tools in violation of Section 1 of the Sherman Act, the purpose and effect of which has been to confine the manufacture of machine tools by each of them to fields of specialization that were not competitive with each other.

5. Plaintiff herein is entitled to relief by way of an appropriate decree of this Court declaring the API agreement to be illegal and void.

6. In view of the litigation pending in the Federal District Court at Detroit, Michigan, between Mac Investment Company and Charles B. DeVlieg, DeVlieg Engineering Company and DeVlieg Machine Company, it is apparent that the DeVlieg group has not been acting in concert with any other members of the combination since the inception of said litigation. And, in view of the disclaimers it is also apparent that certain of the shareholders of API have abandoned the combination brought into existence and continued by the creation of the API agreement. The conduct on the part of the co-conspirators, as evidenced by said litigation and by said disclaimers, lends support to a conclusion that the co-conspirators have withdrawn from the conspiracy. If such conclusion proves to be valid, the conspiracy would have terminated and the granting of an injunction to effectuate such termination would not be necessary. In view of the lack of proof at this time of any threat of future violations, the granting of an injunction against future violations is not appropriate. However, in the light of our observations in the following paragraph, we are unable to decide conclusively as of this writing that the conspiracy has, in fact, terminated.

The order of the Court of Common Pleas of Hamilton County, Ohio, dissolving API and appointing a permanent receiver, contains the following:

> "It is further ordered that the Receiver shall not commence any litigation, or take any steps in connection with existing litigation to which Associated Patents, Incorporated, is presently a party, or in connection with the assets which are the subject of such litigation, without permission of this court."

This provision establishes that API has not been completely dissolved, and that it is awaiting the outcome of litigation that has as its subject matter an asset that could be of considerable value to API, and, in aligning itself as a party plaintiff with Mac Investment Company in this litigation, API has kept in existence at least a part of the complained-of combination. Because of this situation, the Court will retain jurisdiction of this matter until the final disposition of Civil Action 6813 pending in the District Court for the Eastern District of Michigan, and also until there is a final disposition of the dissolution proceedings presently pending in the Court of Common Pleas, Hamilton County, Ohio, at which time, upon reapplication by plaintiff, this Court will determine the request for injunctive relief.

An order in conformity with this opinion may be presented.