**LUCAS MACHINE TOOL COMPANY et al., Plaintiffs,**

v.

**Charles B. DE VLIEG, DeVlieg Engineering Company, and DeVlieg Machine Company, Defendants.**

Civ. A. No. 6813.

United States District Court
E. D. Michigan, S. D.

March 26, 1959.

Rockwell T. Gust and James D. Ritchie of Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., James T. Hoffmann and Arthur J. Hudson, of Hudson, Boughton, Williams, David & Hoffmann and Addison H. Brenan, Cleveland, Ohio, for plaintiffs.

Donald N. Sweeney of Lightner, Crawford, Sweeney, Dodd & Mayer, Clarence B. Zewadski, of Whittemore, Hulbert & Belknap, Detroit, Mich., Ira J. Wilson, Chicago, Ill., John F. McCanna, Oak Park, Ill., for defendant.

LEDERLE, Chief Judge.

1. Plaintiff, Lucas Machine Tool Company was an Ohio corporation. Although in 1948 it sold all of its assets to New Britain Tool Company and in 1950 it changed its name to the Mac Investment Company, it has continued, up to the present time, to prosecute this suit under its original name.

2. Associated Patents Inc., (hereinafter called A.P.I.) is an Ohio corporation and is a patent holding company.

3. Plaintiff, New Britain Tool Company is a Connecticut corporation. Long after the trial (as shown in Finding 66)

it was determined that this plaintiff had purchased all of the assets of plaintiff, Lucas Machine Tool Company in 1948. Its appearance was not entered until January 1958.

4. Defendant, Charles B. DeVlieg, is a resident of Michigan and holds the controlling interest in the two defendant corporations.

5. Defendant, DeVlieg Engineering Company, is a Michigan corporation, but is inactive.

6. Defendant, DeVlieg Machine Company, is a Michigan corporation.

7. Defendant, Charles B. DeVlieg, prior to 1931, was the inventor of certain "Automatic Positioning Mechanism," certain "Back Lash Remover" and certain "Power Transmission Mechanism" for which he filed three applications for Letters Patent which resulted in the issuance of Letters Patent No. 1,981,224; No. 2,002,991; and No. 2,029,094.

8. On September 3, 1931, defendant Charles B. DeVlieg granted to the predecessor of plaintiff, Lucas Machine Tool Company, an exclusive license under his inventions later covered by Letters Patent No. 2,002,991 and No. 2,029,094 in the field of boring and drilling machines.

9. Defendant, DeVlieg, prior to 1933, had also granted licenses under his inventions later covered by the three above identified Letters Patent to The Lodge & Shipley Machine Tool Company, the Carlton Machine Tool Company and Brown & Sharpe Manufacturing Company, each license being limited to the specific fields in which these three companies operated.

10. Prior to August 3, 1933, the three companies identified in Finding No. 9, together with plaintiff Lucas Machine Tool Company or its predecessor, the defendant DeVlieg Machine Company and defendant Charles B. DeVlieg, organized plaintiff, A.P.I., each of the five companies owning twenty per cent of the stock.

11. Plaintiff, A.P.I., operated only as a patent holding company, to which defendant, DeVlieg, assigned his three applications for Letters Patent No. 1,981,224; No. 2,002,991; and No. 2,029.094.

12. On August 3, 1933, representatives of the five stockholder companies of A.P.I. met in Cincinnati, Ohio, in the offices of the lawyers representing The Lodge & Shipley Machine Tool Company to discuss the terms and conditions under which A.P.I. would administer the inventions owned or to be owned by it, and an agreement as of that date was entered into between the parties.

13. The agreement of August 3, 1933, provided, among other things, the following:

(a) The agreement was applicable to DeVlieg's inventions later covered by DeVlieg's three Letters Patent listed in Finding No. 11, together with any "improvements or betterments" of said inventions made or controlled by any of the parties to the agreement.

(b) The agreement was to exist until the last of the Letters Patent ever to be owned by A.P.I. expired.

(c) The members were obligated to make prompt disclosure to A.P.I. of any "improvements or betterments" of the subject matter of the inventions owned by A.P.I. and to assign the same to A.P.I.

(d) A "Declaration of Uses" was provided which set forth the specific machine tool field in which each member could operate exclusively, and each member was exclusively licensed in its exclusive field under all patents owned or to be owned by A.P.I.

(e) Plaintiff, Lucas Machine Tool Company was assigned the field relating to all horizontal boring, drilling and milling machines.

(f) Defendant, DeVlieg Machine Company, was assigned to the field relating to milling and broaching machines.

(g) Each member agreed to pay A.P.I. a royalty for operating under the patents in its specific field.

(h) A.P.I. had the sole right to extend the field of any member, provided it did not conflict with the field of any other member, unless consented to by such other member.

(i) A.P.I. was to defend all suits brought against any of the members for infringement because of their manufacture of machines in their exclusive fields, which included any inventions owned by A.P.I.

(j) A.P.I. could grant non-exclusive licenses under its patents to strangers, but only in fields not allocated to any of the five members.

14. At the time this suit was filed, A.P.I. owned the following ten patents:

| Patent No. | Date Issued | Patentee | Title |
| --- | --- | --- | --- |
| 1,962,979 | June 12, 1934 | Bennett | Machine Tool |
| 1,981,224 | Nov. 20, 1934 | DeVlieg | Automatic Positioning Mechanism |
| 2,002,991 | May 28, 1935 | DeVlieg | Backlash Remover |
| 2,029,094 | Jan. 28, 1936 | DeVlieg et al. | Power Transmission Mechanism |
| 2,059,091 | Oct. 27, 1936 | DeVlieg | Backlash Compensator for Machine Tools |
| 2,105,914 | Jan. 18, 1938 | Fritzch | Power Transmission Mechanism |
| 2,119,705 | June 7, 1938 | DeVlieg | Backlash Eliminator Mechanism |
| 2,123,825 | July 12, 1938 | DeVlieg | Combination Positioning & Locking |
| 2,124,852 | July 26, 1938 | Graves et al. | Machine Tool |
| 2,205,634 | June 25, 1940 | Sizer | Screw and Nut Driving Connection |

15. On December 16, 1941, Letters Patent No. 2,666,647 for "Horizontal Boring Machine" was issued to plaintiff, Lucas Machine Tool Company, as assignee of the inventors Lucas and Stephan.

16. On January 18, 1944, Letters Patent No. 2,339,435 for "Machine" was issued to plaintiff, Lucas Machine Tool Company, as assignee of Stephan.

17. Neither of these patents were assigned by plaintiff, Lucas Machine Tool Company, to A.P.I. although Letters Patent No. 2,339,435 disclosed and claimed certain means for automatic positioning which was an "improvement or betterment" of A.P.I.'s Letters Patent No. 1,981,224.

18. In 1940 defendant, DeVlieg Machine Company, needed two horizontal boring machines to be used in its war effort.

19. It was unable to obtain these machines from plaintiff, Lucas Machine Tool Company, so this defendant decided to build the machines and defendant DeVlieg began designing the same.

20. Plaintiff, Lucas Machine Tool Company, through its president, Henry Lucas, was notified of defendant's intentions and Henry Lucas advised defendants that it was the logical thing to do.

21. By April of 1941 defendant DeVlieg had completed drawings showing the design of his horizontal boring machine and had supplied Henry Lucas with a set of said prints, and on a visit to Detroit by Henry Lucas the design had been discussed in detail with him.

22. On September 27, 1941, defendant DeVlieg Machine Company had completed its first horizontal boring machine and Henry Lucas was notified of that fact and photographs of the machine were sent to him.

23. Defendant, DeVlieg, advised Henry Lucas that great pressure was being placed upon him to manufacture his hori-

zontal boring machine for others to assist in the war effort.

24. Henry Lucas in the latter part of 1941 again visited the defendant, DeVlieg Machine Company, and, at that time, saw the completed horizontal boring machine which was known thereafter as the DeVlieg "Jigmil".

25. Plaintiff, Lucas Machine Tool Company, has always manufactured and sold horizontal boring machines only wherein the spindle extended longitudinally of the bed of the machine.

26. Lucas patent No. 2,266,647 was based upon a horizontal boring machine known as "Lucas No. 61" and made in about the year 1936, but not sold by Lucas, wherein the spindle extended transversely of the bed of the machine.

27. Defendant's new horizontal boring "Jigmil" also had its spindle extending transversely of the bed of the machine.

28. On the various visits of Henry Lucas to the DeVlieg plant in 1941, it was agreed between him and defendant DeVlieg that the plaintiff, Lucas Machine Tool Company, would continue to manufacture its particular type of horizontal boring machine and defendant, DeVlieg Machine Company, could make its type of boring machine, and neither would make the type made by the other.

29. However, after Lucas patent No. 2,266,647 issued on December 16, 1941, and early in 1942, Henry Lucas advised defendant DeVlieg that the claims of this patent read on DeVlieg's new boring machine, but, as the new machine was not in direct competition with the Lucas machines, a license agreement might be worked out.

30. DeVlieg replied that, while he believed the Lucas patent was invalid, he would meet with Henry Lucas to discuss the matter.

31. Henry Lucas died in March 1942 and this meeting was never held.

32. Defendant DeVlieg filed an application for Letters Patent covering the fundamental novelty incorporated in his new "Jigmil" and Letters Patent No. 2,-391,398 was issued on December 25, 1945.

33. Plaintiff, Lucas Machine Tool Company, made no further direct complaint against the defendants' invasion of Lucas' exclusive field but on or about July 31, 1945, plaintiff Lucas Machine Tool Company, by letter complained to A.P.I. that DeVlieg had violated the A.P.I. agreement by invading its exclusive field.

34. Plaintiff, Lucas Machine Tool Company, late in 1945 or early in 1946 also notified defendant, DeVlieg Machine Company, that it was infringing Letters Patent No. 2,339,435.

35. No settlement between defendants and plaintiffs was arrived at because plaintiffs insisted that defendant DeVlieg assign his Letters Patent No. 2,-391,398 to A.P.I. thereby giving plaintiff, Lucas Machine Tool Company, an exclusive license thereunder in the horizontal boring machine field. Defendant DeVlieg refused to assign.

36. A meeting of the stockholders of A.P.I. was held at Atlantic City in April of 1947 at which meeting a majority of the stockholder companies agreed to join with plaintiff, Lucas Machine Tool Company, in a suit against the defendants, but at plaintiff, Lucas Machine Tool Company's expense to enforce the A.P.I. agreement and to enforce plaintiff Lucas Company's alleged personal rights against defendants.

37. In April of 1947 defendants, DeVlieg and DeVlieg Machine Company, commenced a Declaratory Judgment suit in the Cleveland District Court against plaintiff, Lucas Machine Tool Company, to determine the validity and infringement of Letters Patent No. 2,266,647 and No. 2,339,435.

38. This suit was dismissed by the Court on motion of Lucas Machine Tool Company because its corporate name had been improperly alleged in the complaint as The Lucas Machine Tool Company.

39. On July 16, 1947, A.P.I. and Lucas Machine Tool Company, as plaintiffs, filed this suit against defendants.

40. The complaint included four causes of action, two of which were personal to the plaintiff, Lucas Machine Tool Company, and two of which involved all of the parties.

41. In the first cause of action it was alleged that defendants, by manufacturing their so-called "Jigmil," had violated the exclusive license agreement entered into September 3, 1931, by and between defendant Charles B. DeVlieg and plaintiffs' predecessor, Lucas Machine Tool Company.

42. In the second cause of action it was alleged that defendants had violated the A.P.I. agreement by manufacturing and selling their "Jigmil" which embodied the inventions covered by the patents set forth in Finding No. 14 and by refusing to assign to A.P.I. defendants' Letters Patent No. 2,391,398, which failure damaged both plaintiffs, but particularly Lucas Machine Tool Company.

43. In the third cause of action plaintiffs alleged that by the manufacture of their "Jigmil," defendants were infringing each of the ten patents owned by A.P.I. and listed in Finding No. 14.

44. In the fourth cause of action plaintiff, Lucas Machine Tool Company, alleged that by the manufacture of their "Jigmil" defendants were infringing Letters Patent No. 2,266,647 and No. 2,-339,435, owned by plaintiff, Lucas Machine Tool Company.

45. On September 28, 1948, plaintiffs filed an Amended Complaint. This Amended Complaint was substantially the same as the original Complaint except that Letters Patent No. 2,002,991 was dropped from the first cause of action and the claims to be relied upon in the two remaining patents were listed, and seven of the ten patents owned by plaintiff A.P.I. were dropped from the second and third causes of action.

46. On December 24, 1948, plaintiff filed a second Amended Complaint. This Complaint was substantially similar to the first Amended Complaint except that in the first cause of action Letters Patent No. 2,002,991 was again included.

47. Defendants' Answers to the Complaint and various Amended Complaints were substantially the same.

48. Prior to trial, many depositions were taken and stipulations were made relating to alleged prior uses.

49. Discovery proceedings were also used by both parties prior to trial.

50. The trial was commenced before this Court on November 29, 1949, and was concluded in January of 1950.

51. The Court, prior to the commencement of the trial, and during the trial, stated that, in its opinion, the A.P.I. agreement restrained competition and was in violation of the Antitrust Statutes and, in view of that fact, it was submitting the A.P.I. agreement to the Department of Justice.

52. In view of the possible invalidity of the A.P.I. agreement, defendants' counsel suggested that the case go forward on that cause of action alone wherein defendants were accused of infringing Letters Patent No. 2,266,647 and No. 2,339,435 of the plaintiff, Lucas Machine Tool Company. Plaintiff's counsel vigorously disagreed on the stated ground that the evidence to be produced was so intertwined among the four causes of action that it would be impractical, if not impossible, to try any cause of action separately.

53. The Court, therefore, received evidence on all four causes of action during the trial.

54. During the trial plaintiffs objected to much of the testimony given by various witnesses in view of the "Dead Man's Statute" because of the fact such testimony revolved around Mr. Henry Lucas, who died in 1942.

55. The Court granted this motion as to all of the questioned testimony except the testimony of defendant, Charles B. DeVlieg, the Court holding that plaintiffs, by their actions, had waived the protection of the "Dead Man's Statute" with regard to defendant DeVlieg's testimony.

56. After the trial, and on June 13, 1950, defendant moved to amend its An-

**504**

swer to the second Amended Complaint to include the defenses, first, that the A.P.I. agreement was unenforceable because it was in violation of the Antitrust Laws and, second, that plaintiffs had come into Court with unclean hands.

57. On July 14, 1950, this Court granted defendants' motion to amend its Answer.

58. The defenses, added by amendment to defendants' Answer to the second Amended Complaint, were thoroughly briefed by the parties and were argued before the Court. This Court did not pass upon the merits of the matter, for in 1951 the Department of Justice filed suit in this District Court against A.P.I. and its five stockholder companies alleging a conspiracy to violate the Antitrust Laws.

59. The Government case was tried and on June 20, 1955, this District Court (Judge Thornton sitting) held that the conspiracy was proven and that the A.P.I. agreement violated the Antitrust Statutes in that it imposed many unreasonable restraints against competition as is more fully set forth in that opinion United States v. Associated Patents, Inc., 134 F.Supp. 74.

60. It appearing to the Court (Judge Thornton) that the parties involved in the conspiracy had abandoned the same prior to judgment, no injunction was issued but the Court ruled, among other things, that in view of the pendency of this present action, Civil Action No. 6813, the Court would retain jurisdiction until the final disposition of the Civil Action, at which time, upon reapplication by the Government, the Court would determine any request for injunctive relief.

61. Defendants appealed directly to the Supreme Court from Judge Thornton's decision and on February 27, 1956, the Supreme Court affirmed without an opinion. Mac Investment Co. v. United States, 350 U.S. 960, 76 S.Ct. 432, 100 L.Ed. 834.

62. On June 13, 1956, this Court, in the present suit, granted plaintiff, Lucas Machine Tool Company, permission to file a third Amended Complaint.

63. The third Amended Complaint dropped A.P.I. as a party plaintiff and omitted all causes of action set forth in the prior complaints and amended complaints except the fourth cause of action wherein plaintiff, Lucas Machine Tool Company, charged that the defendants were infringing Letters Patent No. 2,-266,647 and No. 2,339,435.

64. This Court, in its Order permitting the filing of the third Amended Complaint containing this sole cause of action, dismissed the other three causes of action with prejudice.

65. Defendants repeated their Answer to this cause of action, including the defense of unclean hands.

66. This Court ordered discovery proceedings by defendant DeVlieg Machine Company subsequent to its Order permitting the filing of the third Amended Complaint and prior to final arguments, which resulted in putting into evidence the following facts:

(a) In December 1948, plaintiff Lucas Machine Tool Company divested itself of all right, title and interest in Letters Patent No. 2,266,647 and No. 2,339,435, evidenced by assignments DX 118 and DX 119 transferring all ownership in said patents to New Britain Machine Company, a corporation of Connecticut.

(b) Concurrently with the execution of said assignments, plaintiff Lucas Machine Tool Company sold and transferred to said New Britain Machine Company, its physical assets, patents, patent rights, trade marks, name and good will as a going concern, for a purchase price of $850,000.00, evidenced by DX 117, Acquisition Agreement.

(c) Under said Acquisition Agreement (Paragraph 5) New Britain Machine Company acquired all rights under this Civil Action No. 6813 and agreed to pay all costs and expenses with respect to such action.

(d) At the time of filing the third Amended Complaint in this action (and contrary to paragraph 5 of such com-

plaint) or at any subsequent time, said Lucas Machine Tool Company was not the owner of Letters Patent No. 2,266,-647 and No. 2,339,435, nor of any interest therein.

(e) Pursuant to said discovery proceedings and defendants motion to dismiss this action on the ground that the alleged Lucas Machine Tool Company is not the real party in interest said motion was overruled by Order of this Court on condition that The New Britain Machine Company be added as a party plaintiff, and pursuant thereto said New Britain Machine Company entered its appearance as a party plaintiff for the further continuance of this action. (Feb. 4, 1958).

67. Claims 3 and 4 of patent No. 2,-266,647 alleged to be infringed, read as follows:

"3. A machine of the character described comprising: a bed having a main section and a transversely extending auxiliary section; a reciprocable work table supported on the main section of said bed for movement longitudinally thereof and in a horizontal plane; a column rising from the auxiliary section of said bed; a reciprocable spindle head supported on one side of said column for vertical movement; a longitudinally reciprocable horizontal rotatable spindle extending transversely of the direction of movement of said table; members located on said spindle head for controlling the reciprocal movements of said spindle head and spindle and the rotation of said spindle; and members for controlling the reciprocal movements of said table; said last-mentioned members being located on the side of the main section of said bed adjacent to said column and in front of said spindle head.

"4. A machine of the character described comprising: an L-shaped bed; a reciprocable work table supported on one section of said bed for reciprocation in a horizontal plane; a column rising from the other section of said bed at one side of said table; a reciprocable spindle head supported on said column for vertical movement; a longitudinally reciprocable horizontal rotatable spindle extending transversely of the direction of movement of said table and at one side of said column; and members for controlling the reciprocal movements of said table, spindle head and spindle, and the rotation of said spindle; said last-mentioned members being located on the sides of the machine which form the enclosed angle of the base."

68. These two claims are invalid for the patentees have not described their alleged invention in such clear, concise and exact language which would permit one skilled in the art to practice the same, for at no place in the specification or drawings of this patent do the patentees describe the specific internal mechanism or the manner in which the controls, located in the included angle between the main bed and the auxiliary bed, are attached or connected to the internal mechanism so that such controls will operate such mechanism.

69. Prior to the commencement of this suit defendant Charles B. DeVlieg designed, developed and was instrumental in marketing a number of bed type milling machines and boring machines which, in the order of their succession, were known as: "Rigidmil" developed in 1924; "Supermil" developed in 1928; "Electromatic" developed in 1931; "Toolmil" and "Bormil" developed in 1934–5; "Jigmil" developed in 1941.

70. The "Electromatic" was manufactured for the defendants by plaintiff, Lucas Machine Tool Company, and many of the features of this machine, including the manner in which the transversely located auxiliary bed and spindle head column were attached to the side of the main bed, were included in the Lucas No. 61 machine upon which this patent is based.

71. During the prosecution of the application for this Lucas patent and in attempting to differentiate claims 3 and

4 from the cited prior art patent to Sears No. 1,540,809, the patentees specifically recited those elements found in the claims which were lacking in Sears.

72. In differentiating other cited prior art from claims 3 and 4 the patentees urged that such patents did not disclose an L-shaped bed. However, in discussing the patent to Sears, the patentees did not urge that Sears failed to disclose an L-shaped bed.

73. The patentees conceded by their silence that Sears does disclose an L-shaped bed as contemplated by the Lucas et al. patent. Plaintiff is estopped from now asserting that the machine of Sears, or any other machine having a bed similar to Sears, is not an L-shaped bed.

74. The drawings and the specification of this patent fail to disclose an L-shaped bed as defined by plaintiffs' witnesses and either this testimony must be ignored or the patent is invalid for lack of disclosure.

75. The disclosure of the patent teaches the requirement of a main bed and a transverse auxiliary bed providing an included angle therein. The disclosure does not require that the auxiliary bed be located at the extreme end to one side of the main bed but only that it be located to one side of the main bed so that the tool spindle projects transversely across the center of the bed.

76. Plaintiffs have admitted that the positioning of the controls in the included angle between the main bed and the auxiliary bed of the patented machine, was the most natural place to locate them.

77. Machine tools of the type disclosed in this patent having L-shaped beds and having controls located in the included angle between the main bed and the auxiliary bed together with all of the other elements of the claims, are found in the patent to Archea No. 1,958, 507 issued in 1934.

78. This Archea patent is not a paper patent for in 1927 Cincinnati Milling Machine Company sold to City Machine & Tool Company a machine made in accordance with this Archea patent.

79. The Giddings & Lewis 30 Series Catalogue, defendants Exhibit 25, was available to the public in the Detroit Public Library ever since January 15, 1937. The machine disclosed in this catalogue constitutes a complete anticipation of claims 3 and 4 of the Lucas patent.

80. Giddings & Lewis in 1935 sold a machine to Goodman Manufacturing Company, Chicago, and it was stipulated that this machine was in public use prior to March 23, 1937. This machine is a complete anticipation of claims 3 and 4 of this Lucas patent.

81. None of this prior art was before the Patent Office when considering the issuance of this Lucas patent.

82. There is no invention in claims 3 and 4 of this Lucas et al. patent in view of the prior art.

83. Patent No. 2,339,435 contains nine claims of which claim 1, reading as follows, is charged to be infringed:

"1. In a horizontal boring and milling machine of the character described, the combination of: a bed having a column adjacent to one end thereof; a saddle movably supported on said bed; a table member movably supported on said saddle; a spindle head member movably supported on said column; power means for causing said members to move at a relatively fast speed; power means including a reversible electric motor for causing said members to move at a relatively slow speed; a source of power for said reversible electric motor; means for initiating the actuation of the first-mentioned power means to move one of said members at the relatively fast speed; means for stopping said member in a predetermined position to within a fraction of a thousandth of an inch comprising an electric circuit including means actuated by the movement thereof for rendering the first-mentioned power means inoperative to continue the movement of the member and the second-men-

tioned power means operative to move the member at a relatively slow speed, and means actuated by continued movement of said member at the relatively slow speed for disconnecting said reversible electric motor from its source of power and connecting it to the source of power until it comes to rest in such a manner that it tends to rotate in the reverse direction; and means for visually indicating the accuracy with which the member stops with respect to the selected position."

84. With respect to the alleged invention disclosed in claim 1, plaintiff's counsel Mr. Hudson, stated during the trial:

"The sole invention resides in taking that rapid traverse motor which he would have anyway, and moving it rapidly and then by suitable means going to a slower speed and then plugging the motor. Now, that was his invention if there is any invention. It lies right in that, you draw a circle around that and that is his invention. (R. 906)

"Now, there is no question but what the invention so far as the Stephan patent is concerned resides in the method of handling the progress of that table, rapid traverse, and then slower, and the plugging. It is, what will I say, it was the novel thing. It was the thing which he added. (R. 1473)"

85. Claim 1 is specifically directed to the old style table type horizontal boring machine wherein the spindle projects longitudinally of the bed of the machine.

86. This limitation of the claim is borne out by the specification and drawings of the patent and by the arguments of the applicant during the prosecution of his application in attempting to avoid the prior art.

Applicant had proposed an original claim 5 which was not limited to any specific type of boring machine. The Examiner rejected this claim on the prior art patent to Doram et al. 2,007,180.

87. The prior art patent to Doran discloses exactly the same subject matter which plaintiff's counsel admitted was the sole invention embodied in claim 1 except that, instead of stopping the motor and the movement of the table by "plugging," Doran used "dynamic braking."

88. The Patent Office Examiner, in rejecting original claim 5, stated that plugging a motor to a stop and stopping a motor by dynamic braking, were both well known in the art and were equivalents.

Stephan acquiesced in this rejection and cancelled original claim 5.

89. The automatic positioning of the table by the plugging of the motor admittedly being the only invention, if any, in claim 1 of the Stephan patent, plaintiff is now estopped from contending that claim 1 defines invention in view of Stephan's acquiescence in the rejection of original claim 5 which was directed solely to the same subject matter.

90. Claim 1 of the patent is invalid in view of file wrapper estoppel.

91. The general type of machine defined in the claim in suit, comprising a bed having a column, a saddle movable on the bed, a table member movable on the saddle, and a spindle head movable on the column, is old in the art as illustrated by the following patents:

| Ingle | 1,123,881 |
| McCarty | 1,302,395 |
| Gallimore | 1,858,491 |
| Davis | 1,936,384 |
| Young | 2,251,863 |

92. Power means for selectively moving two or more members at relatively slow speeds or at relatively fast speeds were old in the art as exemplified by the patents to Archea 1,932,378, Doran et al. 2,007,180, Ingle 1,123,881, Davis 1,936,-384 and McCarty 1,302,395.

93. Means for positioning machine tool members with sequential movements at fast speed and slow speed were disclosed in the prior patents to Sassen 2,102,249 and Doran 2,007,180. In fact,

Doran discloses three speeds for movement of both the table and the spindle head.

94. The first machine built in accordance with the disclosure of the Doran patent was designed to do planing, milling, drilling and boring, and embodied automatic power indexing. The automatic indexing involved movement at fast speed, slow speed, and stopping by dynamic braking. This mode of positioning was used on the table and each of the two spindle heads of these machines.

95. The machine disclosed in the Doran patent 2,007,180 was commercially manufactured and sold as early as 1934 by G. A. Gray Co. of Cincinnati and more than a dozen such machines have been sold. The first of those machines was shipped to Sperry Gyroscope Company.

96. Two prior publications, one entitled "Control of Electric Motors" by P. B. Harwood, published in 1936, and the other entitled "Motor and Control Publications" by George H. Hall, published in 1937, show that "dynamic braking" and "plugging" were both available in the art for selection for more than two years prior to Stephan's application for patent.

97. The prior art also includes the Bennett patent 2,068,840 of 1937 disclosing a plugging stop for a machine tool and the Ridgway patent 2,224,108 of 1939 in addition to Doran showing dynamic braking for a similar purpose.

98. To apply the Doran electrical braking device to the horizontal boring and milling machine of Young 2,251,863 which is designed to move the saddle or the spindle head to a predetermined position by sequential fast and slow speeds, is an obvious expedient.

99. The McCarty patent 1,302,395 discloses a horizontal, boring, drilling, milling and tapping machine. The Doran et al. patent 2,007,180 discloses a "device for moving a machine member by power means an exact distance or to an exact position." The application of the Doran device to the McCarty horizontal,

boring, drilling, milling and tapping machine is within the province of a mechanic skilled in the art.

100. Claim 1 in suit of Stephan patent 2,339,435 specifies, in addition to the type of machine disclosed and the means for accurately positioning the table member or spindle head member includes "means for visually indicating the accuracy with which the member stops with respect to the selected position." This refers to the indicator 122 mounted on the machine, from observation of which the point of stoppage of the movable member may be ascertained.

101. The use of means for visually indicating the accuracy with which the member stops with respect to the selected position is shown to be old in the art by each of the patents to Doran 2,007,180, Kearns 1,467,043, and Armitage 2,158,649.

102. Claim 1 of Stephan patent 2,339,435 defines no invention and is invalid over Doran 2,007,180 alone or Doran taken in connection with Young 2,251,863 or McCarty 1,302,395.

The addition to a machine of an indicator for visibly indicating the movement of a member is merely an aggregation of a machine and an indicator.

103. Claim 1 of Stephan 2,339,435 specifies:

"A table member movably supported on said saddle, a spindle head member movably supported on said column, power means for causing said members to move at a relatively fast speed, power means including a reversible electric motor for causing said members to move at a relatively slow speed."

104. The Stephan patent discloses a single motor and transmission mechanism therefrom to the table member and to the spindle head member which may be selectively connected to these members to move them at relatively fast speed or at relatively slow speed.

105. The accused "Jigmil" has one motor for moving the table at a relatively *fast speed only*. An entirely separate

and independent motor and transmission mechanism are provided for moving the saddle or the spindle head selectively at relatively fast or at relatively slow speed.

106. The "Jigmil" has *no-power means* for moving the table at relatively *slow speed,* as required by the claim.

107. Claim 1 also includes "means for stopping said member (table member or spindle head member) in a predetermined position," which includes, speaking generally, means for shifting from rapid traverse to slow speed advance and means for plugging the motor to a stop by shutting off the current and then applying the current in reverse so that the motor comes to rest under a tendency to reverse, but does not in fact revolve in reverse. The movement of the member is always and continuously in one direction toward the desired position, first, at high speed, then at slow speed and then stop.

108. The saddle member and the spindle head member of the "Jigmil" are positioned with accuracy by means operating upon an entirely different principle from that of the plugging stop disclosed in the patent. In the "Jigmil" the member is moved up to the desired position at relatively fast speed. The motor is then plugged to a stop at which time the member has overrun the desired position. The power is left on the plugged motor until the movable member has started in a reverse direction, whereupon, the rapid traverse motor is shut off and a feed motor is connected to move the member in reverse direction at slower speed until it again reaches the desired position. This slow feed motor is then plugged and reconnected to move in the opposite (original) direction at still slower speed, whereupon, when the movable member again reaches the desired position, the motor is again plugged. At this low speed the member stops this time almost instantaneously but the motor reverses for several revolutions to split the back lash between the feed screw and nut. The movements of the member are: (1) high speed forward past position; (2) slow speed reverse past position; (3) slower speed forward past position; (4) reverse and stop on position.

109. This two-motor control of the "Jigmil" which jogs the member to be positioned back and forth across the line of final positioning and leaves it with accuracy in the predetermined position with all strain or tension relieved by a final reversal of the motor for several revolutions, so that there is no tendency to movement when clamping force is applied, does not respond in structure or function or language to the Stephan claim in suit and operates upon an entirely different principle from Stephan.

110. Claim 1 of Stephan's patent describes the alleged sole invention of the claim by a means and function clause. Interpreting this clause in view of the specification and drawings of the Stephan patent, it is clear that the means used in defendants' "Jigmil" is entirely different from the means disclosed in the Stephan patent. Claim 1 of the Stephan patent is not infringed by defendants' "Jigmil".

111. In both Stephan and Doran the member to be positioned is first driven toward final positioning at high speed, then in the same direction at slow speed, and finally is stopped by stopping the motor. In Stephan the stopping is effected by plugging the motor; in Doran it is done by dynamically braking the motor. In both the movement, always in one direction, is the same and the stopping is the same and effected by mechanically equivalent and well known means.

112. There is less similarity between Stephan and the DeVlieg "Jigmil" than between Stephan and the prior art Doran disclosure. Doran precludes any interpretation of the Stephan claim which would include the DeVlieg "Jigmil". Infringement of Stephan claim 1 by the DeVlieg "Jigmil" is negatived by the prior art Doran structure.

### Conclusions of Law

1. Claims 3–4 of patent 2,266,647 and claim 1 of patent 2,339,435 are all void for want of invention. After considering the state of the art at the

time the applications were filed and the file wrapper history of these claims, one is forced to the conclusion that all the claims in suit belong to that class of claimed inventions described by Mr. Justice Bradley in Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438, as follows:

"It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."

2. It therefore follows that the complaint must be dismissed with costs to be taxed in favor of defendants.