568 F.2d 670
 1977-2 Trade Cases 61,777
 Virgil WEBB, Marion Webb and Larry Webb, d/b/a Fiesta Tours,
and Holiday World Tours, Plaintiffs-Appellees,
v.
UTAH TOUR BROKERS ASSOCIATION, Elaine Blakely, d/b/a
Elaine's Worldwide Travel, John Josephson, Gary Mitchell,
Erma B. Faldmo, Norman B. Faldmo, Arnold White, Erma White,
Norman Cram, Ruth Shields, and Elmer Asper James,
Defendants-Appellants.
 No. 76-1719.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted Nov. 18, 1977.
Decided Dec. 27, 1977.
 
 Stephen G. Morgan, Salt Lake City, Utah (Ford G. Scalley, Salt Lake City, Utah, on brief), for plaintiffs-appellees.
 Lauren N. Beasley, Salt Lake City, Utah (Paul N. Cotro-Manes, Salt Lake City, Utah, on brief), for defendants-appellants.
 Before HOLLOWAY and DOYLE, Circuit Judges, and ROGERS,* District Judge.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 This is an antitrust action which was brought pursuant to 15 U.S.C. §§ 1, 2 and 4. The cause was tried to the court and the judgment was in favor of the plaintiffs. The award for actual damages was in the amount of $31,891. This was trebled. In addition, attorney fees were awarded.
 
 
 2
 The defendants-appellants were tour brokers licensed by the Interstate Commerce Commission. Their business was to organize and conduct bus tours. Plaintiffs-appellees acted as agents for several of the defendants, all of whom were associated together in an organization called the Tour Brokers Association.
 
 
 3
 Plaintiffs allege that the defendants entered into a course of conduct to prevent the entry of plaintiffs into the tour broker business and to eliminate the limited competition which resulted from plaintiffs' efforts. Further, it was alleged that the means used by defendants was refusal to deal with plaintiffs as agents unless the plaintiffs would consent to have a joint bank account with the defendants, placing all money collected from the potential passengers in the account to pay for the transportation and other expenses which were related to the transportation. Defendants allegedly also required that in the advertising only the name of the defendant with whom plaintiffs were operating as an agent was to be displayed.[1] The defendants also filed protests with the ICC opposing the issuance of a certificate to the plaintiffs to become a certified ICC tour broker.[2]
 
 
 4
 On April 30, 1973, eight of the nine members of the Utah Tour Brokers Association brought an action against the plaintiffs seeking to enjoin them from operating illegally as a tour broker and preventing the diversion of traffic and business and the concurrent loss of income and profit. The result of this was that plaintiffs entered into a stipulation and order which enjoined plaintiffs from soliciting for or conducting tours for people in interstate commerce except as an agent for a broker duly licensed through the ICC.
 
 
 5
 The proceedings in court and the proceedings before the ICC, while they have evidentiary value as to defendants' objects and motives, are not per se violations of the antitrust laws. Under the Noerr-Pennington doctrine such activities are generally considered to be exempt from the antitrust laws. See Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). On the other hand, there was evidence of a group conspiracy, the object of which was to refuse to deal with the plaintiffs so as to restrict competition and discourage plaintiffs from obtaining a broker's license.
 
 
 6
 In further support of the boycott theory, there is the evidence that on February 20, 1973, after a number of telephone calls among the defendants, the defendant Josephson sent a letter to other licensed brokers stating that "Several of us have now been working to do something to form a group to be a watchdog for our rights" and to do something about illegal brokerage operations. In his calls he mentioned plaintiffs' license application and encouraged the other members of the group to protest it.
 
 
 7
 On March 13, he sent a letter to the brokers in which he invited them to come to a meeting to discuss some of the proposals which had been made for action by the Utah Brokers Association. The letter said that one of the proposed topics would be "Should we let others use our broker's permit to run competitive tours to the other brokers?" The letter also thanked those brokers who had protested against plaintiffs' application.
 
 
 8
 In the newsletter of March 19, 1973, Josephson wrote:
 
 
 9
 The question has come up about the Webbs who are going from one broker to another trying to use their liscenses (sic) to get into the travel business. Our initial response was that they should become tour operators for us, not to use their own names, but they become conductors on tours that we have sponsored, that bear our names and for which we collect all of the monies. This is the best was (sic) to protect ourselves and not let our business become second rate and perhaps being involved in a suit because of practices which we permit because we do not know what they are. We have asked each broker to hold off making any commitments to any person to use their liscense until we have met on the 29th of March. Please, do not make any commitments until that time when we can discuss the problems and become more united on what we can do to upgrade our profession.
 
 
 10
 NEW BROKER STILL PENDING The last bulletin mentioned that the permit was turned down for the Webbs who were seeking the moon. They asked for only Utah now which is still too much competition for those of us in the business and frankly, it seems strange to me that more of the agents did not oppose them for your business of those who did not oppose your business is apt to be affected by this new entrant. We will likely have a hearing on this matter if they take it that far but this is why we need an organization to watch out for encroachment on our right so thatw (sic) we can fight them.
 
 
 11
 Brokers seeking to join the Association were urged to contact Josephson or Blakely.
 
 
 12
 On April 18, 1973, the organization was perfected. Nine of the thirteen licensed area brokers signed Articles of Association for the Utah Tour Brokers Association. There is some dispute as to whether the organization had in truth been formed earlier. We do not, however, view this as important. The question is whether there was concerted action as evidenced by the letters together with the Articles of Association and the defendants' other actions and statements.
 
 
 13
 There was evidence also that the defendant Blakely withdrew from the plaintiffs the authority to use her license for several tours that they had planned as her agent. Plaintiffs were told that they could operate under her authority if they were willing to advertise only in her name and to establish a joint bank account with her. The ICC ruling required that the name of the broker appear on all ads. Plaintiffs were unwilling to give up advertising in their own business name as well as that of the broker. Mrs. Webb, one of the plaintiffs, testified that she communicated with another member of the Association, Ms. White, soon after, who also refused to deal with plaintiff on the ground that she had checked with the Association and could deal with plaintiff only on the same conditions agreed upon by the Association.
 
 
 14
 Subsequently, Paul Lloyd, a licensed broker and member of the Association, agreed to deal with the plaintiffs for three tours. He was contacted by various members of the Association, including some of the defendants, and was cautioned to be careful about the legalities of his dealings with the Webbs. He was also notified that any violations of ICC regulations would be reported. After these three tours were taken, there were no more arrangements made. In fact, plaintiffs did not thereafter attempt to have contact with members of the Association looking to use of their license.
 
 
 15
 Plaintiffs had to refer their schedule for 1974 tours to Greyhound because they were unable to act as an agent of any of the defendants. Greyhound was a licensed broker, but not a member of the Association. As a result, however, plaintiffs had to pay more money than planned and so they suffered a loss.
 
 
 16
 In seeking reversal, the appellants assert that:
 
 
 17
 1. The findings are not supported by evidence in the case.
 
 
 18
 2. That they are protected by the Noerr-Pennington doctrine.
 
 
 19
 3. The judgment should be set aside because the plaintiffs did not have a license to operate and therefore were disabled from competing.
 
 
 20
 4. There was a failure to prove damages.
 
 I.
 
 21
 TO WHAT EXTENT, IF ANY, WAS THE ACTIVITY OF DEFENDANTS
 
 
 22
 EXEMPT FROM THE ANTITRUST LAWS?
 
 
 23
 Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc., supra, held that the Sherman Act was not violated by action taken to influence political bodies to rule or conclude so as to foster reduced competition or even monopoly. The Supreme Court noted, however, that in some situations such activity can be a mere sham to cover up what is actually no more than an attempt to interfere with the business relationships of the competitor. It was carefully pointed out that in the sham case the Sherman Act would be applicable.
 
 
 24
 The decision of the Supreme Court in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), dealt with further aspects of the problem of possible antitrust violations in connection with applications for new certificates by carriers and the consistent opposition to such certificates by certificate holders. The Supreme Court stated the proposition succinctly when it said that "Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." 404 U.S. at 513, 92 S.Ct. at 613. The Court went on to hold that an allegation that defendants had not sought to influence the administrative body, but had instead abused the administrative process so as to harass competitors by deterring them from resorting to it, so as to deny them free and meaningful access to the administrative process, was cognizable under the antitrust laws. Therefore, the meaning which was given by the Supreme Court in Trucking Unlimited to the sham concept made it synonymous with misuse or corruption of the legal process, and the utilization of the court or the administrative agency to the extent of monopolizing the available process could constitute a sham. (The case was remanded for trial.)
 
 
 25
 The converse of the Trucking Unlimited holding was that the use of the court or administrative agency in a valid manner is exempt activity from the viewpoint of the antitrust laws. See Semke v. Enid Auto Dealers Association, 456 F.2d 1361 (10th Cir. 1972).
 
 
 26
 It follows, then, from a reading of the Supreme Court's decision that the actions taken before the Commission cannot of themselves furnish a basis for an antitrust action. Plaintiffs' claim must be limited to the alleged combination looking to the establishing of a boycott against the plaintiffs.
 
 II.
 
 27
 WAS THERE SUFFICIENT EVIDENCE IN SUPPORT OF THE TRIAL
 
 COURT'S FINDINGS THAT THE DEFENDANTS JOINTLY
 AGREED TO BOYCOTT THE PLAINTIFFS SO AS
 TO ELIMINATE THEM AS POSSIBLE
 
 28
 COMPETITORS?
 
 
 29
 There was sufficient evidence to support the trial court's findings that the defendants came together and had a meeting of the minds, and thereafter acted in concert for the purpose of preventing the plaintiffs from obtaining a certificate for the purpose of preventing the plaintiffs from entering the business and for the purpose of eliminating them as possible competitors. Most of this evidence was given by the defendants in the form of minutes of the meetings of their trade association, statements in their newsletters and their actions. There was no question at the trial about the fact that defendants were intent on preempting the field and excluding any participation by the plaintiffs.
 
 
 30
 In addition to the newsletters and the minutes of meetings, the acts of the defendants preventing the plaintiffs from participating in the tour broker business were significant. The combination of the nine members, together with their concerted action, made an important contribution to the final exclusion of plaintiffs from the tour broker field. The trial court also found as a matter of law that the plaintiffs and defendants were competitors. It rejected the contentions of the appellants that because the plaintiffs had no tour broker's license they were not entitled to compete with defendants, and also rejected the contention that the defendants could on this account take concerted action to restrain the plaintiffs from competing.
 
 
 31
 The February 20, 1973 letter, again written by Josephson, and the March 19, 1973 newsletter, contained statements soliciting concerted action under the Sherman Act §§ 1 and 2. Defendants argue that the new restrictive conditions which they imposed were perfectly valid and within the scope of the exemption. We disagree. There are no regulations of the ICC calling for joint bank accounts in the case of an agency relationship. The regulations of the ICC did contemplate that agents would act for brokers and there was a regulation requiring that the name of the broker be used in such circumstances, but the ICC did not require that the name of the broker be used exclusively.
 
 
 32
 The cases showing that the agents were contemplated are Paragon Travel Agency, Inc., 96 M.C.C. 79 (1964); Kirkland Broker Application, 61 M.C.C. 691 (1953). The ICC in fact declined to promulgate a regulation forbidding the use of the agent's name in tour advertising. Passenger Transportation in Special Operations, 112 M.C.C. 160, 190-91 (1970). The conclusion to be drawn from this is that it was not permissible for the defendants to use the means which they used in their efforts to monopolize the field and exclude the plaintiffs.
 
 
 33
 In considering and weighing the scope of the antitrust exemption against the boycott efforts of the several defendants, it is helpful to compare tour brokers with a public power utility situation such as that which was before the court in Cottonwood Mall Shopping Center, Inc. v. Utah Power & Light Co., 440 F.2d 36 (10th Cir. 1971), cert. denied, 404 U.S. 857, 92 S.Ct. 107, 30 L.Ed.2d 99. There we said that since the furnishing of electric power was impossible unless a certificate had been granted to the supplier, one who had no certificate was ineligible to sell electricity. Tour brokering is in sharp contrast to the public utility in that there can be trade within the general area without a license. Cottonwood Shopping Center is distinguishable on its facts.
 
 III.
 
 34
 DOES THE CONCERTED EFFORT ON THE PART OF THE DEFENDANTS
 
 SEEKING TO BOYCOTT THE PLAINTIFFS VIOLATE THE
 
 35
 ANTITRUST LAWS?
 
 
 36
 In our judgment such an effort is a per se violation. See United States v. General Motors, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).
 
 
 37
 General Motors, supra, was an action to enjoin General Motors Corp. and three associations of Chevrolet dealers in the Los Angeles area from participating in an alleged conspiracy to restrain trade in violation of § 1 of the Sherman Act by eliminating sales of new Chevrolets through discount houses and referral services. Here an association sought to get the cooperation of General Motors in order to eliminate competition by refusing to deal with discounters. The Supreme Court held that this was a conspiracy in restraint of trade with joint collaborative action by dealers, associations and General Motors to eliminate a class of competitors by terminating dealings between them and a minority of licensed dealers. The Supreme Court cited Klor's, Inc., supra, for the proposition that the elimination by joint collaborative action of businessmen from access to the market constituted a per se violation of the Sherman Act.
 
 
 38
 The Silver case was in the same vein. Two Texas broker-dealers in securities were not members of the New York Stock Exchange. They arranged to have direct wire telephone connections with members of the Exchange in New York City. These members applied to the Exchange for approval of the connections. Temporary approval was granted. It later was discontinued without notice to the plaintiffs. Both of the broker-dealers suffered. One was forced out of business. The Supreme Court ruled that the Securities and Exchange Act did not impliedly repeal the antitrust laws, so that the regulation under which the Exchange acted did not automatically bar the antitrust act. The Court concluded that the plaintiffs were entitled to a hearing as to the reasonableness of the action taken. The effect of the decision was stated as being to prevent unnecessary anti-competitive activity outlawed by the Sherman Act.
 
 
 39
 In Klor's a chain of department stores and ten national manufacturers were charged with conspiring to refuse to sell to the plaintiff, operator of a retail appliance store. It was determined that the complaint showed a group boycott forbidden by the Sherman Act.
 
 
 40
 It is apparent that in the case at bar the trial court was correct in recognizing that the activities of the defendants went far beyond the use of legal procedures in order to protect the public interest. The activities here were designed to and succeeded in bringing about a boycott of the plaintiffs, which reduced their competitive significance and caused a substantial loss.
 
 
 41
 Accordingly, we must conclude that the governing law is that set forth in the boycott cases rather than the exemption decisions in Noerr Motor Freight, Inc. and its progeny.
 
 IV.
 
 42
 WAS THE EVIDENCE SUFFICIENT TO JUSTIFY THE AWARD OF DAMAGES?
 
 
 43
 The trial court determined that plaintiffs were entitled to $10,165 actual damages for losses incurred on tours which were taken during the year 1974. An additional $21,726 was awarded for losses on tours which were projected but not taken. These two amounts were added and then trebled pursuant to 15 U.S.C. § 15. The resultant amount was $95,673 together with costs and an attorney's fee in the amount of $10,000.
 
 
 44
 The actual damages were, first, for losses on tours which had actually been taken in 1974, and these losses were the result of higher costs of alternative arrangements brought about by the boycott. The second part, with respect to which the $21,726 was awarded, was for loss of projected profits on tours which had been planned but not actually taken.
 
 
 45
 A. We first consider the actual losses resulting from having to pay a higher tariff for the 11 tours taken in 1974. With respect to these, the evidence was that plaintiffs did not contact the members of the Association with regard to the tours which they wished to take in 1974. They did not even contact Mr. Lloyd, who had dealt with them before. This was in the belief that he would refuse because of prior harassment of him by the Association. Instead they made alternative arrangements with the Greyhound Bus Company, which was also a licensed tour broker, but not a member of the Association. They had to pay an additional amount to Greyhound. They had been able to obtain the same transportation service for 70 cents per mile from the other licensed brokers. However, with Greyhound they were obliged to pay a Special Operations Bus Order tariff of three and one-half cents per person per mile. Of the eleven tours operated they had to pay this higher rate for eight tours. Plaintiffs calculated that they suffered a total loss of $10,165 as a result of having to pay the higher tariff for the tours that they took.
 
 
 46
 This was in our judgment a proper item of damage. It was shown to have been directly related to the injury inflicted. The statute requires that this be trebled.
 
 
 47
 B. The remaining question pertains to the loss of projected profits on the eight additional tours which were not carried out in 1974. The testimony was that plaintiffs planned eight tours in addition to the eleven discussed above, in 1974, but due to the losing of money on the ones they took they decided not to take these. Here we note that plaintiffs are not claiming actual loss, but are projecting future profits. Their evidence was that a 25% Profit figure was usually built into the tour price. At the same time, they said that they had had a very limited experience having conducted no more than seven or eight tours in all of the prior years. Had they taken the eight tours which are now under consideration, there would have been a total of 19 for 1974.
 
 
 48
 There is no evidence offered to show that from prior experience they would have made a profit had the conditions been ideal, that is had the defendants allowed them to use their certificates as agents. As we view it future profits cannot rest on possibilities. It must be more tangible and prior experience is about the only foundation on which this kind of evidence can rest.
 
 
 49
 It is for this reason that we conclude that the lost profits on projected tours are more speculative than real. The court is not justified in rendering a judgment based on possibility or speculation. True, damages cannot be fixed with desired certainty. However, the proof must be reasonable under the circumstances. In the present record there is no evidence that the plaintiffs ever made a profit, and there is a complete dearth of evidence allowing a projection that a profit would have been made from the seven tours which were not taken.
 
 
 50
 There is a lack of evidence having a tendency to show that plaintiffs would have realized future profit even if the defendants had not created the boycott. This deficiency in the evidence is crucial in the award of damage based on projected profits. The case law, while not illiberal, does require that there be a tangible foundation from which the finder of the facts can determine that a reasonable probability exists that profits would have been made.
 
 
 51
 In Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), the contention of the defendant was that the plaintiff and others had conspired to exclude it from foreign markets by denying patent licenses as exporters of American-made television and radio sets. In that instance experts were used by Zenith to show its percentage share of the U.S. market as compared to its actual share of the Canadian market, and the experts concluded that considering Zenith's proficiency it would have been able to achieve a similar market share in Canada. The Supreme Court conceded that damage issues in antitrust actions based on exclusion from a market "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." 395 U.S. at 123, 89 S.Ct. at 1576. The Court reiterated what it had said in Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), that the jury may make a reasonable estimate of damages based on relevant data. An award based upon damages could be upheld, according to the Zenith Court, even though the exact amount of damages could not be determined. Similarly, in the Bigelow case, cited in Zenith, there was a comparison of the profits of plaintiff's theater and a similar competing theater which had not suffered discrimination.
 
 
 52
 In Zenith there was also a reference to Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), wherein the defendant tried to promote its monopoly by discontinuing sales to plaintiff at dealer's discounts. This change brought plaintiff's business to an abrupt halt. Plaintiff had had an established business, offering a full line of materials, and the Court upheld an award of lost profits based upon a determination of damages based on pre-termination profits. The difference between that case and ours is the lack here of a history of successful business.
 
 
 53
 The Ninth Circuit in Rangen, Inc. v. Sterling Nelson & Sons, Inc., 351 F.2d 851 (9th Cir. 1965), cert. denied, 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853, upheld an award of lost profits and in doing so said:
 
 
 54
 considering Nelson's position in the industry and its success in bidding when public offers were invited in 1962, we think the trial court was justified in finding that Nelson would have obtained one fourth of the business. (absent the antitrust violations).
 
 
 55
 Estimates of profits were based on a considerable profit margin on the sales plaintiff had made.
 
 
 56
 The testimony of expert witnesses analyzing economic data is frequently considered important. In Hobart Bros. Co. v. Malcolm T. Gilliland, Inc., 471 F.2d 894 (5th Cir. 1973), cert. denied, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150, the court did state that it would sometimes be necessary to admit proof bordering on the speculative in order to implement the policies of the antitrust laws, especially where the wrongdoer has made a precise calculation of damages impossible. However, plaintiff there had presented the testimony of an expert economist to support its claim of lost profits.
 
 
 57
 In Greene v. General Foods Corp., 517 F.2d 635 (5th Cir. 1975), cert. denied, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348, the court found that there had been sufficient evidence of the profits plaintiff would have made had its distributorship not been wrongfully cancelled. An expert witness who had extensively examined plaintiff's financial records, as well as analyzing statistics about the general economic climate in the area, had made an estimate which, though imprecise, was found reasonable.
 
 
 58
 Finally, in Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir. 1964), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046, the court held that there had been no error in excluding plaintiff's testimony as to his opinion of the profit he lost as a result of defendant's antitrust violations. Where the offer of proof was based solely on his opinion and experience, without any evidence of how his estimate had been made, the testimony was inadmissible.
 
 
 59
 It is to be concluded, then, that although the courts are not strict about the kind of foundations or theories which are employed so long as it is credible and substantial; nevertheless, some such foundation must be shown. It will not be rejected where there is some prior experience with which to make a comparison. With such evidentiary foundation there can be a projection; where, on the other hand, the profits are mere possibilities and are too far removed from reality, they must be held unacceptable.
 
 
 60
 Accordingly, the judgment of the district court is affirmed with the exception of the adjustment of the damage award. As to that, the trial court is directed to vacate the prior judgment and enter the judgment mentioned above.
 
 
 
 *
 Of the District of Kansas, sitting by designation
 
 
 [1]
 Plaintiffs did not have a license and thus had to operate as an agent of the defendants or other licensed broker until it could obtain one
 
 
 [2]
 The ICC finally denied plaintiffs' application because the evidence did not demonstrate a public need