**INSTRUCTIONAL SYSTEMS DEVELOPMENT CORPORATION, Plaintiff-Appellant,**

v.

**AETNA CASUALTY AND SURETY COMPANY and Doron Precision Systems, Inc., Defendants-Appellees.**

No. 82–2105.

United States Court of Appeals, Tenth Circuit.

April 22, 1987.

Frank Gregory (Louis W. Bullock, Jr., Tulsa, Okl., with him on the brief), Tulsa, Okl., for plaintiff-appellant.

Sidney S. Rosdeitcher of Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D.C. (Howard S. Veisz, of Kornstein, Veisz & Wexler, New York City, and James Fellers, of Fellers, Snider, Blakenship, Bailey & Tippins, Oklahoma City, Okl., with him on the brief), for defendant-appellee Aetna Cas. and Sur. Co.

Clifford A. Jones, of Bradford, Haswell, Jones, Oklahoma City, Okl. (Peter B. Bradford, with him on the brief), for defendant-appellee Doron Precision Systems, Inc.

Before HOLLOWAY, Chief Judge, and SEYMOUR, Circuit Judge.*

---

* The Honorable Jean S. Breitenstein, United States Circuit Judge, heard oral argument in this case but did not participate in the final decision.

SEYMOUR, Circuit Judge.

Plaintiff Instructional Systems Development Corporation (ISDC) brought an antitrust action against Aetna Casualty and Surety Company (Aetna) and Doron Precision Systems, Inc. (Doron). ISDC alleged, *inter alia*, that Aetna and Doron had conspired to violate sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982), and that Doron individually had violated section 2. The district court granted summary judgment in favor of both defendants on the two conspiracy claims, and in favor of Doron on the section 2 claim.[1] On appeal, ISDC contended that the court erred in granting summary judgment because genuine issues of fact exist on all three claims. In our original opinion we agreed with ISDC's position, and reversed.

Defendants Doron and Aetna have petitioned for rehearing and rehearing en banc. We grant the petition for rehearing in part to address their contention that, in reversing the summary judgment entered below on the claim under section 1 of the Sherman Act, we employed a standard inconsistent with the one recently applied by the Supreme Court in *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We find no ground for disturbing our panel opinion on the basis of this argument. *See infra* Part IIB. We also grant rehearing because we believe our prior opinion misstated the nature of ISDC's claim. We have modified our original opinion accordingly. No active member of the court having requested a poll of the en banc court, defendants' request for rehearing en banc is denied.

## I.

## BACKGROUND

In deciding whether summary judgment is appropriate, the evidence must be viewed in the light most favorable to the party against whom the judgment is sought, *National Aviation Underwriters, Inc. v. Altus Flying Service, Inc.*, 555 F.2d 778, 784 (10th Cir.1977), and factual inferences tending to show triable issues must be resolved in favor of the existence of those issues, *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1377 (10th Cir.1980). When the evidence is viewed in this light, the record shows the following.

Aetna is the developer of driving simulation, a driver education system in which students experience simulated driving conditions in the classroom using simulator equipment and a series of filmed driving situations. Driving simulator systems are primarily used by high schools and colleges and are sold throughout the United States and Canada. Aetna has a long history of involvement in driver education and has developed a reputation as a leader in this field. Through its Driver Education Division and its regional representatives, Aetna has marketed nationwide a number of driver education materials, including driving simulator films used in the simulator hardware. Although Aetna does not manufacture any simulator devices, it holds a number of patents on simulators and owns the trademark "Aetna Drivotrainer."

Since 1956, Aetna has licensed a series of manufacturers to produce driving simulators under its trademark. Under these licensing agreements, the manufacturer was primarily responsible for selling a completed simulator system, although Aetna provided marketing assistance to the manufacturer and produced promotional films. After a series of assignments over the years, Visual Educom, Inc. (VEI) began manufacturing the hardware in 1970. In 1974, VEI announced it was getting out of the business, and Aetna and VEI began to search for a replacement. Aetna identified two potential manufacturers, Doron, and

---

**1.** ISDC originally claimed against Aetna individually under section 2 of the Sherman Act, and against both defendants under the Robinson-Patman Act, 15 U.S.C. §§ 13–13b, 21a (1982). The court denied Aetna's motion for summary judgment on the claims under section 2 and the Robinson-Patman Act. After the court refused

ISDC's motion for an interlocutory appeal of the partial summary judgment in favor of Aetna and Doron, ISDC dismissed its remaining claims against Aetna. ISDC had earlier withdrawn its Robinson-Patman claims against Doron.

James Hall, who had founded ISDC in 1974.

Until 1973, Doron had been a distributor of other manufacturers' driving simulator equipment. One of these manufacturers was Singer, which produced simulators for Allstate. Doron acquired Singer's production capabilities and a library of Allstate films in 1973. It produced simulators for Allstate until 1974, when Allstate terminated its driving simulation program and stopped producing films.

In 1974, Doron met with Aetna to discuss film purchases and to explore the possibility of replacing VEI as Aetna's hardware manufacturer. Hall and Aetna were also discussing Hall's potential acquisition of VEI, but Hall was unable to obtain financing. Doron subsequently acquired all of the assets of VEI, and Doron and Aetna then began negotiations resulting in a written agreement between the two in 1975. At the time Doron and Aetna were negotiating, ISDC had not begun production of a simulator and Doron was the only active manufacturer of simulator equipment in the United States. Although both Doron and Aetna marketed simulator films, the record indicates that Doron merely marketed the Allstate films it had acquired from Singer, and that Aetna was the only active film producer.

In July 1975, Aetna and Doron executed what was styled as a joint venture agreement.[2] Under the terms of this agreement, Doron was to build equipment bearing the Aetna Drivotrainer trademark, to service and provide parts for Drivotrainer systems, to contribute engineering services for continued development of the system, and to undertake primary responsibility for marketing the system. The contract also required Doron to replace the films it owned and marketed with films produced by Aet-

na, and provided that Doron would purchase all of its films from Aetna except those films which Doron requested and Aetna declined to produce. Aetna granted Doron an exclusive license to use the Aetna Drivotrainer trademark and also agreed to provide certain promotional services to Doron. Aetna specifically agreed: (1) to provide six pieces of advertising a year in national educational publications; (2) to refer to Doron all simulator systems sales leads developed through advertising, exhibits, personal contact, or other sources; (3) to participate jointly with Doron in five national educational conferences a year; (4) to provide teacher training to Doron in conjunction with the sale of new systems sold with Aetna films; and (5) to provide systems software expertise to Doron on key sales activity. The agreement permitted Aetna to sell its films to other companies, and did not expressly prohibit Aetna from providing the aforementioned promotional assistance to others. Doron and Aetna operated under this agreement from 1975 to 1980.

In December 1975, Hall approached Aetna with a request to buy films for use in ISDC's development and production of a similar system. Aetna provided the films. In April 1976, ISDC submitted simulator system bids to three school districts and at the same time entered into an agreement with Aetna which permitted ISDC to acquire and sell Aetna simulator films. ISDC and Doron were both actively engaged in simulator systems sales until ISDC ceased operation in 1978. During this period, although Aetna provided ISDC with some assistance, it refused to assist ISDC in promotions or sales as it did Doron under the written agreement. The record contains evidence that ISDC requested assistance similar to that provided to Doron

2. The agreement did not constitute a true joint venture. One authority has defined a joint venture for antitrust purposes as

"an integration of operations between two or more separate firms, in which the following conditions are present: (1) the enterprise is under the joint control of the parent firms, which are not under related control; (2) each parent makes substantial contribution to the joint enterprise; (3) the enterprise exists as a

business entity separate from its parents; and (4) the joint venture creates significant new enterprise capability in terms of new productive capacity, new technology, a new product, or entry into a new market."

J. Brodley, *Joint Ventures and Antitrust Policy,* 95 Harv.L.Rev. 1523, 1526 (1982) (footnote omitted). The agreement between Aetna and Doron did not meet this test.

and that ISDC repeatedly complained to Aetna personnel about what ISDC perceived as unfair and disparate treatment vis-a-vis Doron. Moreover, Aetna acquiesced in Doron's request to recommend to simulator purchasers a joint film curriculum containing Doron's Allstate films, which ISDC was unable to obtain.

After ISDC failed, it brought suit against Aetna and Doron alleging numerous violations of the Sherman Act. The thrust of ISDC's claims is as follows. ISDC alleges that at the time Aetna and Doron executed their contract, Aetna held a monopoly in the simulator film industry and Doron held a monopoly in the production and distribution of simulators. ISDC further claims that Aetna's unique and powerful position in the driver education field enabled it to exert considerable influence over the driving simulator hardware market when it licensed and promoted Doron and the Drivotrainer trademark. ISDC claims that Aetna's exclusive support of Doron, pursuant to the contract and otherwise, constituted an unlawful restraint of competition and resulted from a conspiracy to maintain Aetna's monopoly of the film market and to enable Doron to monopolize the simulator market. ISDC also claims that Doron engaged in predatory conduct in both simulator pricing and other non-price activities.

## II.

## PROPRIETY OF SUMMARY JUDGMENT

Summary judgment may not be granted when a genuine issue of material fact is presented to the trial court. *Exnicious v. United States,* 563 F.2d 418, 423 (10th Cir. 1977). "Where different ultimate inferences may properly be drawn the case is not one for summary judgment." *Security National Bank v. Belleville Livestock Commission Co.,* 619 F.2d 840, 847 (10th Cir.1979). Generally, summary judgment should be used sparingly in antitrust litigation. *See Poller v. Columbia Broadcasting System Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

■ However, allegations of restraint of trade must be supported by significant probative evidence in order to overcome a motion for summary judgment. *See First National Bank v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Natrona Service, Inc. v. Continental Oil Co.,* 598 F.2d 1294, 1298 (10th Cir.1979). "A party resisting a motion for summary judgment must do more than make conclusory allegations, it must 'set forth specific facts showing that there is a genuine issue for trial.'" *Dart Industries, Inc. v. Plunkett Co.,* 704 F.2d 496, 498 (10th Cir.1983) (quoting Fed.R. Civ.P. 56(e)).

### A. The Section 1 Claim

Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies in restraint of trade. ISDC argued below that Doron and Aetna undertook joint activity both pursuant to the contract and beyond that set out in the agreement itself as part of a conspiracy to drive ISDC out of the simulator market. ISDC contended that this joint activity was a *per se* violation of section 1 or, alternatively, that it was an unlawful restraint of trade under the Rule of Reason. The district court concluded as a matter of law that the contract itself was not a *per se* violation and that ISDC had failed to present any evidence of an agreement by defendants to undertake joint activity outside the contract. The court did not address whether any of defendants' conduct was illegal under the Rule of Reason.

■ Exclusive licensing of a patent, copyright, or trademark is not a violation of section 1 of the Sherman Act so long as the agreement does not extend beyond marketing arrangements reasonably necessary to effectuate the rights granted. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 19, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). "Nonetheless, [a] trademark cannot be legally used as a device for Sherman Act violation." *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 599, 71 S.Ct. 971, 975, 95 L.Ed. 1199 (1951); *see also*

*Ford Motor Co. v. United States,* 405 U.S. 562, 576 n. 11, 92 S.Ct. 1142, 1151 n. 11, 31 L.Ed.2d 492 (1972) ("Even constitutionally protected property rights such as patents may not be used as levers for obtaining objectives proscribed by the antitrust laws").

■ In this case, the contract on its face appears to contain an agreement to divide markets by providing that Aetna would be the sole producer of simulator films and that Doron would phase out its sale of films in competition with the Aetna films. Although an agreement to divide markets is a *per se* violation of section 1, *see United States v. Associated Patents,* 134 F.Supp. 74 (E.D.Mich.1955), *aff'd mem.,* 350 U.S. 960, 76 S.Ct. 432, 100 L.Ed. 834 (1956); *see also United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); 2 J. von Kalinowski, Antitrust Laws and Trade Regulation § 6F.01[3] (1985), ISDC does not allege competitive harm from the allocation of the film market directly. Rather, ISDC asserts that Aetna and Doron particiated in joint activity under the contract and outside it that was intended to drive ISDC from the hardware market, and that Aetna was motivated to enter into this conspiracy by its desire to maintain its monopoly in the software market. ISDC asserts that the contract and the additional joint activity constituted a conspiracy that extended beyond a legitimate marketing arrangement in violation of section 1.

While we agree with the district court that ISDC's claim does not present a *per se* violation, we cannot agree with the court's conclusion that ISDC failed to raise a fact issue with respect to joint activity under this alleged larger conspiracy. In a letter to Aetna dated January 18, 1977, Doron's attorney stated:

> "Pursuant to Doron's Agreement with Aetna, it surrendered a valuable right, the right to continue in the business of producing software for use with its equipment. This not only was an economic loss, but also transformed Doron from a systems company, independent of others for its supply of necessary software, into a hardware manufacturer dependent on Aetna for its survival as a viable business.
>
> "This was only done because of the promises of Aetna, expressed in the Agreement, that a special relationship would henceforth exist between Doron and Aetna, a joint venture in which both parties would cooperate to promote the sale of Doron hardware, and the phase-out of Doron software over a 5–year period."

App., vol. XIII, at 1367. The letter was written in response to Aetna's decision to end its promotion of the joint film curriculum containing Doron's Allstate films. Although this joint curriculum was not required by the contract, the attorney asserted on behalf of Doron that Aetna's decision violated the agreement and that if Aetna did not retract its decision Doron would assert its right "to produce Doron films." *Id.* at 3153. Aetna agreed to proceed with a joint curriculum. *Id.* at 1361. Subsequently, in December 1978, A.L. Foster, Aetna's administrator of driver education, analyzed in an interoffice memo the pros and cons of maintaining the contract and recommended its continuance. In so doing, Foster pointed out that "Doron could decide to go into film production which could affect our income," and further that "Doron's sales force can be extremely tough competitors." *Id.* at 3122.

■ There is thus evidence that the agreement between Aetna and Doron went beyond what was reasonably necessary to effectuate the trademark license and therefore violated section 1 under the Rule of Reason. This Rule proscribes acts which unreasonably restrict competitive conditions, *see National Society of Professional Engineers v. United States,* 435 U.S. 679, 690, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1978), and requires an analysis of "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Id.* at 692, 98 S.Ct. at 1365; *see also Tekton, Inc. v. Builders Bid Service, Inc.,* 676 F.2d 1352, 1354 (10th Cir.1982). In addition to the evidence tending to show a division of product markets, ISDC

presented evidence, *inter alia,* that Aetna and Doron agreed upon the recommended joint film curriculum described above, and that Aetna referred all overseas hardware sales to Doron even though the contract did not extend to overseas sales and Doron did not sell the Aetna Drivetrainer overseas. We conclude, contrary to the district court's ruling, that a factual issue exists as to whether the above acts were undertaken pursuant to an unlawful agreement between defendants. The nature of the anticompetitive impact of these acts, as well as other alleged joint activity outside the contract, cannot be resolved as a matter of law.[3] Accordingly, we reverse the grant of summary judgment on ISDC's section 1 claim.

## B. The Matsushita Opinion

The recent ruling in *Matsushita,* 106 S.Ct. 1348, does not alter our conclusion. In *Matsushita,* the plaintiffs asserted an illegal agreement under which the defendants allegedly entered into a predatory pricing conspiracy in this country and a conspiracy to maintain artificially high prices in Japan. The alleged object of the conspiracy was to drive the plaintiffs, who competed with the defendants in this country, out of the market and to enable the defendants to ultimately recover monopoly profits in the United States. The district court granted summary judgment for the defendants and the court of appeals reversed. The Supreme Court ruled that the appellate court did not apply the proper standards in evaluating the propriety of summary judgment, and remanded for further proceedings.

The Supreme Court's reversal was based on its conclusions: 1) that the predatory pricing conspiracy was so economically implausible that the defendants had no motive to engage in it; and 2) that the evidence of an agreement to enter into this conspiracy was indirect and ambiguous. The Court held that under these circumstances, the plaintiffs had failed to create a fact issue on the existence of a section 1 conspiracy.

The Court reiterated its holding in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), that "[t]o survive a motion for summary judgment .., a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita,* 106 S.Ct. at 1357 (quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471).

The instant case is readily distinguishable from *Matsushita.* The anticompetitive acts asserted in this case as violative of section 1 are not obviously economically costly to the conspirators as was the predatory pricing scheme alleged in *Matsushita.* The alleged goal of the section 1 conspiracy here was in fact achieved, contrary to the situation in *Matsushita.* *See* 106 S.Ct. at 1359. Moreover, as discussed above, Aetna could reasonably have been economically motivated to help Doron achieve a hardware monopoly in order to avoid the threatened direct competition with Doron in the sale of films, thus protecting its own monopoly in the simulator software market. Most importantly, the evidence in this case of an agreement to undertake joint activity violative of section 1 cannot be characterized as indirect or ambiguous. Under the guidelines of *Matsushita* and *Monsanto,* the evidence here tends to exclude the possibility that Doron and Aetna acted independently in pursuing the conduct challenged under section 1. Accordingly, our decision is not contrary to *Matsushita* and the cases upon which it relies.

## C. The Section 2 Claim

To establish a conspiracy to monopolize in violation of section 2, a plaintiff must show an agreement, overt acts in furtherance of that agreement, and a specific intent to monopolize any part of interstate commerce. *See* 3 von Kalinowski § 7.01[1]; *see also Perington Wholesale, Inc. v. Burger King Corp.,* 631 F.2d 1369, 1377 (10th Cir.1979). "Although the offense of conspiring to monopolize appears

---

**3.** Because the alleged conspiracy involved conduct both pursuant to and outside the contract, the legality of the agreement itself is not determinative.

to address the means by which competition is harmed, the gravamen of that offense is the intent to achieve the unlawful result." *Perington*, 631 F.2d at 1377.

ISDC contends that Aetna and Doron conspired to monopolize the markets for simulator films and hardware in violation of section 2. The district court granted summary judgment on this claim based on its conclusion that ISDC had failed to provide any evidence tending to show the existence of a conspiracy. We disagree.

The record contains evidence that Doron had the specific intent to obtain a monopoly by driving its only competition, ISDC, out of the hardware market. Doron's national sales manager, Thomas Bart, stated in deposition testimony that his goal was to put ISDC out of business.[4] *See, e.g.*, App., vol. XIX, at 4531, 4533. There is also evidence that Aetna employees in charge of negotiating and implementing the contract with Doron were well aware of Doron's monopolistic desires. The deposition of Walter R. Horner, who supervised Aetna's field representatives, states that Bart had voiced his intentions regarding ISDC to Horner, and that Horner had reported it to his supervisor, Dean R. Cook. App., vol. XXXIII, at 8031–32, 8043–44, 8047. Horner testified that Aetna sales representatives were to do whatever Doron wanted on a priority basis and that Doron called the shots. *Id.* at 8017–18. In the interoffice memo of A.L. Foster referred to above, Foster pointed out that ending the agreement would benefit Aetna by giving it "complete control of the decision making process on ... [its] operations, ... [its] activities and what ... [it] decide[s] to produce. Although Doron's input could be important, they would not take part in any final decision." *Id.* at 3167. This and other evidence clearly permits a factfinder to infer that Doron and Aetna made joint deci-

sions, pursuant to the contract and outside it, which furthered Doron's goal of driving ISDC out of business.[5]

Further, the evidence tends to show that maintaining a cooperative business arrangement with Doron was to Aetna's advantage. As we noted in Part IIA, *supra*, Doron could affect Aetna's film income by producing and marketing its own films in competition with Aetna. As we have described, there is evidence that when Aetna sought to abandon the recommended joint film curriculum, Doron threatened to market its own films and Aetna then agreed to continue the program.

In sum, the record contains evidence supporting the inference that Aetna and Doron agreed to the alleged anticompetitive acts complained of in furtherance of Doron's monopoly of the hardware market and Aetna's monopoly of the film market. Accordingly, summary judgment on the section 2 conspiracy claim was inappropriate.

### D. The Section 2 Monopolization Claim

Next we examine the propriety of the summary judgment in favor of Doron on ISDC's claim that Doron had monopolized the hardware market in violation of section 2. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). ISDC contends that Doron undertook predatory pricing and other predatory acts as part of its plan to achieve a

---

4. Whether a particular employee's intent may be attributable to the company depends on the employee's role in the decisional process of the company. VII P. Areeda, Antitrust Law ¶ 1506 (1986). Bart testified that he reported to Doron's president.

5. In addition to the contract itself, the joint film curriculum, and the reference of overseas sales

discussed in part IIA *supra*, we note evidence that Aetna, for example, sought and agreed to suggestions from Doron's president which resulted in unfavorable changes in the film purchasing agreement between Aetna and ISDC. *Cf. Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984).

simulator monopoly.[6] The district court concluded as a matter of law that Doron's pricing was not predatory, and it did not address the other predatory conduct ISDC urged violated section 2. Our review of the record convinces us that the summary judgment on this claim must also be reversed.

■ No consensus exists among courts and other authorities on the standards by which predatory pricing is established. *See, e.g., Pacific Engineering & Production Co. v. Kerr-McGee Corp.*, 551 F.2d 790, 797 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *Transamerica Computer, Inc. v. IBM Corp.*, 698 F.2d 1377, 1383–89 (9th Cir. 1983); 3 von Kalinowski § 10.01–03 & table 10.1 at 10–43. The Supreme Court recently noted the differing views but found it unnecessary to resolve the issue. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, —— U.S. ——, 107 S.Ct. 484, 493 n. 12, 93 L.Ed.2d 427 (1986). In this circuit, although the relationship between price and marginal cost or average variable cost is a valuable indicator of predatory pricing, sales above average variable cost do not preclude a finding of predatory pricing if other factors are present indicating unreasonably anticompetitive behavior. *See Pacific Engineering*, 551 F.2d at 797.[7]

■ ISDC presented evidence through the deposition of its expert, Dr. Bates, that Doron sold systems below its full cost but above average variable costs.[8] Although sales above average variable cost are valuable evidence that predatory pricing has not occurred, we must examine the record for evidence of other factors indicating predation. ISDC offered evidence that after VEI left the hardware market and Doron was the only manufacturer, the market price of simulators increased considerably, and customers began complaining. *See, e.g.,* App., vol. XXIX, at 7006; vol. XXXIII, at 7913, 8022. When ISDC entered the market, Doron's prices underwent an immediate and dramatic drop. App., vol. XXIX, at 7006; vol. XXXIII, at 7933. After ISDC went out of business, Doron's prices again rose sharply. App., vol. XXXIII, at 7933. Dr. Bates stated his opinion that Doron's pricing pattern was of a predatory character. App. vol. XXII, at 5300–01.

There is also evidence that when Doron was bidding against ISDC, it often priced its product below the minimum price established in its pricing book. *See, e.g.,* App., vol. XXXV, at 8405. Bart described the Doron price list as the salesmen's bible because it told them how to arrive at the selling price. A salesman who sold a system below the minimum price established in the book did not get a commission on the sale unless authorized by Bart. *See* App., vol. XXXVIII, at 9079–81. In addition,

---

**6.** The district court did not consider whether the evidence tended to show that Doron possessed monopoly power in the relevant market. ISDC presented evidence that Doron possessed at least 80% of the market in simulator hardware during the relevant period, and that the driving simulator system was a unique driver education tool offering advantages not found in other driver teaching methods. This evidence is sufficient to create a fact question on Doron's possession of monopoly power.

**7.** On rehearing, Doron contends that it is entitled to judgment on this claim as a matter of law under *Pacific Engineering* because it presented undisputed evidence of excess capacity. The evidence Doran points to is in an affidavit of Doron's president filed in support of a motion for summary judgment. Doron did not rely on the assertion of excess capacity to support its motion for summary judgment, however, so ISDC was not required to rebut that evidence. Nor did the trial judge rely on excess capacity in granting summary judgment. Although excess capacity is a relevant factor to be considered, *see Pacific Engineering*, 551 F.2d at 796–97, consideration of its existence and importance in this case must be left for the trial court on remand.

**8.** The district court rejected Dr. Bates' conclusion that Doron sold below its total cost, taking issue with his method of arriving at that conclusion and stating that ISDC had conceded at a pre-trial conference that Dr. Bates' approach was erroneous. We have examined the transcript of that hearing and we find no such concession by ISDC. To the contrary, ISDC argued that Dr. Bates' method was proper. *See* rec., vol. XVIII, at 4323–24. Although the criticisms voiced by the court may go to the weight a fact finder would give Dr. Bates' testimony, they do not render it without any evidentiary value as a matter of law.

Horner stated in his deposition that Bart had said he was going to set a price below the level at which Doron would make a profit in order to take business away from ISDC, *see* App., vol. XXXIII, at 8044; vol. XXXIV, at 8205; and that Doron could outlast ISDC in an underbidding situation, vol. XXXIII, at 8046. Finally, the non-price conduct described infra at 21–22, constitutes evidence of predatory intent. *Cf. Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 697, 87 S.Ct. 1326, 1333, 18 L.Ed.2d 406 (1967) (industrial spying evidence of predatory intent in Robinson Patman price discrimination case).

We believe that all of this evidence, considered as a whole, is sufficient to create a fact issue on whether Doron engaged in short term price cutting to secure long term monopoly profits, *see Pacific Engineering*, 557 F.2d at 797, and whether its tactics were unrelated to increased efficiency in the usual sense, *see* 3 von Kalinowski § 10.02[1].

In addition to its allegation of predatory pricing, ISDC claims that Doron violated section 2 by other predatory conduct, including bribing the public officials who purchased simulator equipment and disparaging ISDC's product. Doron responds with the novel argument that such acts cannot be a section 2 violation because they do not require the use of monopoly power. We disagree. Although a monopolization claim requires a showing of monopoly power, the acts complained of need not involve the use of that power if they contribute to its acquisition or maintenance. *See, e.g., Superturf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1280–82 (8th Cir.1981); *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 927 (9th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981); *see generally* L. Sullivan, Antitrust § 43 (1977); 3 von Kalinowski § 10.4.. *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 919–28 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975), which Doron cites to support its theory, is inapposite. This court held there that ordinary business practices did not become "predatory" simply because IBM may have possessed mo-

nopoly power. Our references in *Telex* to the use of monopoly power must be read in that context.

Section 2 is violated when monopoly power is gained or held by conduct constituting an abnormal response to market opportunities. *See* Sullivan §§ 35, 43. Predatory practices are illegal if they impair opportunities of rivals and are not competition on the merits or are more restrictive than reasonably necessary for such competition. III P. Areeda & D. Turner, Antitrust Law ¶ 625b (1978). In order to rise to a section 2 violation, however, the exclusionary conduct must appear reasonably capable of contributing significantly to creating or maintaining monopoly power. *See id.* ¶ 626c, g.

ISDC presented evidence that Doron bribed purchasing officials, filed lawsuits against school districts when it lost a bid to ISDC, thereby delaying payment to ISDC, and consistently disparaged the ISDC simulator to potential customers. For example, there was testimony that a Doron sales manager paid an influential Arizona official fifty dollars for every Doron car unit installed in Arizona, and that this alleged bribery denied ISDC access to the Arizona market. App., vol. XXXIII, at 7887–88. We also note evidence that a Doron employee took pictures of a partially completed ISDC system and circulated them as typical of completed ISDC installations. App., vol. XXXI, at 7366–67; vol. XXXVIII, at 9160. The above examples constitute conduct which, if proven, is not reasonably related to competition on the merits. Moreover, we cannot say as a matter of law that the exclusionary practices alleged by ISDC could not have had a significant impact on Doron's maintenance of monopoly power. Accordingly, we conclude that ISDC has presented sufficient evidence to withstand a motion for summary judgment on its section 2 claim against Doron.

As an alternative ground for upholding the summary judgment on this claim, Doron contends that its efforts to influence public officials and driver edu-

cation policies are immune from antitrust attack under the Noerr-Pennington doctrine. This doctrine exempts from antitrust challenge activity designed to influence legislative and administrative bodies, in order to protect the right to petition and to engage in political activity. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 509–10, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). However, bribery, or misuse or corruption of governmental processes are outside the protection of the Noerr-Pennington doctrine and may give rise to an antitrust claim. *See Hydro-Tech Corp. v. Sundstrand Corp.,* 673 F.2d 1171, 1175–76 & n. 6 (10th Cir.1982); *Webb v. Utah Tour Brothers Association,* 568 F.2d 670, 674 (10th Cir.1977); *Semke v. Enid Automobile Dealers Association,* 456 F.2d 1361, 1366 (10th Cir.1972); Sullivan § 238, at 742. A fact issue exists on the extent, if any, to which Doron's efforts to influence public officials were implemented by conduct unprotected by the Noerr-Pennington doctrine.

### III.

### ANTITRUST INJURY

Finally we consider defendants' argument, not addressed by the district court, that the summary judgments should be sustained because ISDC did not present proof that its failure resulted from the alleged antitrust violations. A plaintiff seeking to recover damages under the antitrust laws must show injury in fact, that is, "a causal connection between the defendant's actions violative of the Sherman Act and the actual injury to the plaintiff's business." *King & King Enterprises v. Champlin Petroleum Co.,* 657 F.2d 1147, 1156 (10th Cir.1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982). "[A] plaintiff's burden to show injury in fact 'is satisfied by its proof of *some* damage flowing from the unlawful conspiracy,' which may be established by reasonable inferences drawn from circumstantial evidence." *World of Sleep, Inc. v. La-Z-Boy Chair Co.,* 756 F.2d 1467, 1478 (10th Cir.) (citation omitted), *cert. denied,* —— U.S. ——, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985).

This record contains evidence, including that of ISDC's experts, from which a factfinder could infer that ISDC suffered antitrust injury as a result of the alleged illegal activity by defendants.

Accordingly, the summary judgment in this case is reversed and the case is remanded for further proceedings.